IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| REINHARD DRECHSEL, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | |
| | § | CIVIL ACTION NO. 3:14-00162-M |
| LIBERTY MUTUAL INSURANCE | § | |
| COMPANY d/b/a PEERLESS | § | |
| INSURANCE COMPANY, | § | |
| | § | |
| | § | |
| *Defendant.* | § | |

**PLAINTIFF'S BRIEF IN SUPPORT OF RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Christine Neill
Texas Bar No. 00796793
cneill@neillbyrnelaw.com
Jane Legler Byrne
Texas Bar No. 03565820
jleglerbyrne@neillbyrnelaw.com
Neill & Byrne, PLLC
3141 Hood Street, Suite 310
Dallas, Texas 75219
(214) 748-7777
(214) 748-7778 (fax)

Attorneys for Plaintiff

## I.    FACTS.

### A.  Drechsel's Employment History and Qualifications

1.      Drechsel was born March 9, 1952 and at the time of his constructive discharge he was sixty years old. (App. 721). He is a decorated Army veteran (App. 4) and college graduate (App. 401). He completed an intensive three month insurance adjusting course (App. 402) and has credits towards AIC certification. (App. 721).[1]

2.      Drechsel worked for twenty-one years as a claims adjuster with Liberty Mutual ("Liberty") and its predecessors. (App. 399). He was hired as a resident claims adjuster (App. 8) and then became as a catastrophic claims (CAT) adjuster. (App. 8; 46). In approximately 2001, he was transferred to the Dallas area to work as an inside property claims adjuster in the personal property lines. (App. 8-9).

3.      Drechsel has been a Claims Specialist II with Liberty since 1999.[2] (App. 597). Claims Specialist IIs have general responsibilities as it pertains to claims made by insureds including: customer contact, claim investigation, settlement and closure of claims. Claims Specialist II is a Grade 12 position.   The claims handled by a Senior Claims Specialist I (hereinafter referred to as Sr. Claims Specialist"), a Grade 13 position and the next highest position, may be more complex and may require different types of approval depending on the amount of money being paid. (App. 139-141; 369-71).[3]

4.      In his Claims Specialist II position, Drechsel regularly, on a day to day basis,

---

[1] It was very difficult to make time for self-development to obtain AIC certification due to the heavy workload. (App. 94).
[2] This was also referred to as Inside Property Loss Specialist II. "Claims Specialist" means the same thing as adjuster or claims representative. (App. 240).
[3] "Senior Claims Specialist I" is used interchangeably with the title "Claims Specialist III."   (App. 369).

handled large losses and claims that were severe in complexity. (App. 721-722). The difference between claims handled by a Specialist II and those handled by a Sr. Claims Specialist is the severity of the claim in terms of dollar amount and "peril"—whether the property is livable. (App. 142). Drechsel was assigned claims greater than $50,000 and claims where the property was unlivable even though he was a Claims Specialist II. (App. 143).   These were the same category of claims handled by Sr. Claims Specialists.   (App. 592). In addition to being independently assigned complex and severe claims, Liberty often had Drechsel back up Sr. Claims Specialist I's when they were absent or left the company.   Drechsel observed that he was one of the only Claims Specialist II's, if not the only Claims Specialist II, who was trusted to back up Sr. Claims Specialists.   (App. 722)   He was frequently reassigned work of Sr. Claims Specialists who went on leave or left the company, including those of Laurie Zimmerman, whose claims were reassigned to him by Theresa Addicks ("Addicks"), a Claims Team Manager who supervised Drechsel. (App. 10-11; 34-36; 108-10; 331-32). Despite the fact Drechsel was handling Senior Claims Specialist level claims he continued to be paid as a Specialist II. (App. 339).

5.     Until approximately 2005 when he was based in St. Louis, Drechsel's manager was Ricky Summerlin ("Summerlin") (App. 10), and subsequently Addicks became his supervisor. (App. 10-11).[4] Addicks reported to Claims Senior Manager Andy Moore ("Moore") and is eighteen years younger than Drechsel. (App. 12; 136; 328).   In June 2010, Claims Team Manager Mike Fawkes ("Fawkes") became Drechsel's supervisor. (App. 329; 403).[5] Fawkes also reported to Moore and is twenty-two years younger than Drechsel.   (App. 136; 153; 241).   Fawkes also at

_____

[4] Drechsel transferred to commercial for a brief stint during which Craig Bailey supervised him, but then transferred back to personal. (App. 341-42).
[5] Fawkes graduated college in 1999 and became an adjuster for Liberty in 2000. Liberty promoted him to manager in 2005.   (App. 241-44).

times supervised:   Tittle ("Tittle") (6 years younger than Drechsel); Enoch Ablohr ("Ablohr") (20 years younger than Drechsel), Alisha Sommers ("Sommers") (11 years younger than Drechsel), Stephanie Babcock ("Babcock") (36 years younger than Drechsel); Candice Boehm ("Boehm") (32 years younger than Plaintiff); Tyressa (Sue) Brown ("Brown") (one year older than Drechsel) and John Hine ("Hine") (18 years younger than Drechsel).   (App. 250-54; 579-81).

6.      Moore became a Claims Senior Manager for Liberty in 2009 (App. 134), managing the inside adjuster teams in the eastern half of the U.S.. (App. 135). Moore is 9 years younger than Drechsel. Moore manages Claims Team Managers in the Central Region, which includes Richardson, St. Louis, and Denver. (App. 118-20).[6]  In 2011 and 2012, Moore reported to Assistant Vice President of Claims Jeff Breor ("Breor), who is nine years younger than Drechsel. (App. 130-34).

7.      Moore's direct reports were required to get approval from him for personnel actions including giving a raise outside an employee's salary range and termination. (App. 137-38; 151-52; 219; 231-33; 678). Moore met with Fawkes about once per month to discuss work issues, including the performance of his unit. (App. 221). Moore also sometimes discussed with Fawkes the contents of employee performance reviews that Fawkes was giving. (App. 145; 162).

**B.   Drechsel's breadth of claims experience and good performance record.**

8.      In the Claims Specialist II position, Drechsel was responsible for managing, investigating, and resolving homeowner's property claims that were severe in complexity, including those involving: vandalism, tornados, fires, water, collapses (due to weight of snow and

---

6 Moore supervised the following other claims unit managers between 2008 and 2012:   Steve Perkins, Mark Andracsek, Edward Elizondo, James Hudson, Laura Dawson, Rob Branson, Melissa Studeny and Corey Chazen (App. 136; 153; 155).

ice), mold and other non-livable claims where the damage was over $50,000. (App. 721-22). He compiled inventories of damaged/lost content, additional living expenses, and loss of use and structural damage. He also investigated and determined coverage of loss, adjusted all elements of property loss claims and referred cases where there was a suspicion of fraud to the special investigative unit and assisted with these investigations. He also assisted on several claims that escalated to litigation. (App. 722). Drechsel and Susan Gregory ("Gregory") were the only Claims Specialist II's whom Moore assigned to handle condominium claims and mechanical breakdown claims as these claims were very time consuming and complicated. (App. 722).

9.      Drechsel consistently received very good annual performance evaluations. In the blunt words of Addicks in Drechsel's 2009 review, "Overall, Reinhard's performance was outstanding." (App. 441). Drechsel excelled in customer service. As reflected in his year 2009 review, Dreschel received numerous customer compliments and no customer complaints. (App. 440). In both the 2010 and 2011 reviews he received praise for doing an excellent job providing value to the customers. (App. 449; 458).   In 2011 he was touted for exceeding his customer service goals. (App. 458).   In approximately January 2012 Moore announced in a meeting that Drechsel had achieved the highest customer service score in the entire region (App. 722), even in the face of a very heavy claims load. (App. 204).

10.      Drechsel had excellent productivity and was recognized by his supervisors as a leader. In his year 2010 review Fawkes lauded him, saying "Reinhard's speed and exceptional customer comments have a significant impact on the results of his group and the success of our organization and his coworkers." (App. 450). In 2011, Drechsel also exceeded his claims diary goals and received two "Bravos," for his contribution to the success of the business unit and

increased productivity.   In the 2011 evaluation Fawkes stated, "With his experience, Reinhard is a leader amongst my unit and the organization on most technical issues."   Drechsel's performance rating increased by two points, from a 100 for 2010 to a 102 for 2011.   (App. 458-59).   In 2009-2011 reviews, Drechsel was recognized as a "mentor" and "informal leader" to his peers. (App. 291; 440; 450; 459).

11.     Drechsel served as a back up to Fawkes when he was out of the office.   Fawkes gave him claims payment and file review authorization for his other subordinates, and Fawkes was satisfied with his performance of this work. He did not give that authorization to any of the other specialists. (App. 290; 305-06).

**C**.   **Drechsel's 2011 FMLA leave and increased workload following his return from leave.**

12.     Drechsel took FMLA leave from July 12, 2011 to August 15, 2011 for procedures and recovery related to a detached retina. (App. 403; 405-06).[7]   He received pressure from Liberty to return to work earlier than he felt ready, which caused him substantial anxiety. (App. 55-57). Although his doctor recommended another medical procedure, he declined it and returned to work early due to concern about his job. (App. 55-57).

13.     After Drechsel returned from this leave, the volume of his claims assignments substantially increased (App. 47-48; 723).   The other Claims Specialist IIs did not have such a large increase. (App. 38-39). In each of October, November and December 2011, Drechsel had more "CVO moderate" claims than any other Specialist II handling such claims, and his overall yearly total for 2011 for such claims was higher than any other Specialist II, even though he had

---

[7] Drechsel had previously taken FMLA and disability leave from November 16, 2010 to January 3, 2011 for treatment relating to a blood disorder, polycythemia (App. 53-54; 403-04). Drechsel and Moore had discussed his polycythemia diagnosis.   (App. 65-66; 213).

been out on FMLA leave twice. (App. 281-83; 461). He also had more pending claims than any other Claims Specialist II, all of whom but one were younger than him (App. 38-39), and was handling complex large loss claims as well. (App. 721-22).

14.     Drechsel complained to Fawkes about his claims load in 2011 (App. 274), indicating that there was an inequality of claims distribution.   Fawkes responded that he was "too old" and maybe he should look for another position. (App. 112).   Addicks commented around that same time that Drechsel was "falling apart." (App. 30-31).[8] Drechsel was forced to come in early and work some weekends to keep up with this unreasonably unmanageable claims load. (App. 50).

**D.     Claims assignment system and procedures at Liberty.**

15.     Liberty distributes claims through the REF System claims distribution system, which allows both supervisors and claims specialists to reassign claims between the Claims Specialists. (App. 32-33; 199-201; 247; 356-58).   Fawkes reassigned new or pending claims on occasion when he thought a Claims Specialist had too many pending claims (App. 248-49),[9] and he and other supervisors, including Addicks, as well as other Claims Specialists, sometimes reassigned claims to Drechsel. (App. 33; 35-36; 339).

16.     A pending claim is a claim that has been assigned and is in the process of being worked on, and a reassigned claim becomes a pending claim for whoever it is reassigned to (App. 39). The brunt of claims in any given year, including 2011 and 2012, is between March 1 and Nov. 1, and Moore does not recall whether there was anything in 2011 or 2012 that would have made the claims load heavier in the off season.   (App. 209-10).

---

[8] Addicks states that is a phrase she uses but denies making the comment about Drechsel. (App. 692)
[9] A new claim automatically becomes a pending claim in the system and once it has done so there is no difference between new and pending claims. (App. 249).

E.   **Liberty Fails to Promote Drechsel or Appropriately Increase his Compensation.**

17.     Beginning in 2009, Drechsel asked Addicks for a promotion to the next level but she said there were no openings, although she did not deny that he was qualified or deserving of a promotion. (App. 722).   Addicks would have talked with Moore about the possibility of promotion or raise for Drechsel, but she does not recall the specifics of the discussions. (App. 362-63). Drechsel protested to Addicks about not being given a raise, and she said he would not be getting any more raises at Liberty because he made too much money.(App. 14-15),[10] even though Drechsel's pay at the time of his discharge was $64,327 per year, which was below the top of his pay band.   The top of his pay band was $69,300.   (App. 399; Liberty's App. 197).   When Drechsel complained about not getting a raise, Addicks told him to turn in his badge and leave the building (App. 676), although subsequently a higher level supervisor contacted Drechsel and told him to return to work. (App. 676).

18.     Drechsel continued to seek promotions and raises from Addicks in 2010 (App. 722), and then again in 2011 and 2012, when he was supervised by Fawkes, including in April 2012, but he was continually told there were no openings. (App. 257; 722) Addicks would have had discussions with Moore about the possibility of promotion or raise for Mr. Drechsel and his salary, but does not recall the specifics of the discussions. (App. 362-63). Fawkes, although admitting Drechsel had the skill set for Sr. Claims Specialist, and that he had requested promotion,

---

[10] Addicks denies making this particular statement. She initially claimed she does not recall whether she had discussions with Drechsel regarding him wanting to get promoted and get a raise, but she cannot say with certainty that he never asked her for a promotion. (App. 344-45; 354). Later in her deposition she admitted that on one occasion Drechsel told her that he thought he deserved a raise and protested the fact that he wasn't getting a raise. Addicks told Moore about Drechsel's protest that he was not getting a raise. (App. 355; 364-65).

did not promote him (App. 90; 257-62), and that he responded that Drechsel should "take on a more leadership role" with his unit, assist with newer employees because of his technical knowledge, and help others. This was his reason for failing to promote Drechsel even though in annual evaluations he had written in 2010 and 2011 he had lauded Drechsel for being a "mentor" and "leader" in the unit. (App. 258-59; 450; 458-59).

19.     Moore was involved in making employment decisions regarding raises for Claims Specialist IIs. (App. 14). Drechsel received a $1,000 increase in 2010 and only a $500 increase in 2011. In 2010 when Fawkes sought approval from Moore for a raise for Drechsel, Moore approved a $500 increase, and when Drechsel complained about the small amount of the raise, Fawkes said it was because with his job performance the system had assigned Drechsel a raise of zero and "something was better than nothing." Fawkes determined Drechsel's performance score even though he only supervised Drechsel for half the year 2010 and he admits Drechsel was not maxed out in his pay band. (App. 262-67).[11]

20.     At his 2011 performance review in approximately March 2012, Fawkes told Drechsel that he would not be getting a pay raise because he was too old, make too much money, and they did not want him there anymore.[12] Drechsel protested this decision not to give him the raise after Fawkes made this statement.   (App. 14; 22-23; 45; 268-69; 681)13.

---

[11]  Moore admits he had discussions with Fawkes about giving Plaintiff a raise but does not remember when those discussions occurred (App. 147), but he does not recall discussing with Fawkes the decision to give Drechsel only a $500 raise. (App. 148-49).

[12]  Fawkes recalls a discussion in 2012 about whether or not Drechsel could get a raise, but does not recall the details. (App. 681).

13 In April 2012, Fawkes gave raises to the following younger employees under his supervision, whose 2011 performance ratings were similar to or not as good as that of Drechsel, whose was 102:   Ablohr (98); Babcock (92); Boehm (102); Fulwood Hopkins (103).   (App. 458-59; 520; 529; 539; 548; 608; 611-615)   Tittle, six years younger than Plaintiff, got a performance rating of 105 and a 4.2% raise.   (App. 670, D. App. 198).   The average percentage raise Fawkes gave in April 2012 was 3.4%.

21.     With respect to raises, Claims Team Managers are allocated a sum of money every year to grant raises within a salary range depending on the employee's performance, and they then have authority to give raises within that range. (App. 245-46).   Fawkes inputted the amount of raises for each employee in the system and Moore reviewed and changed or approved the raises. (App. 246-47; 219; 231-33; 678).   Moore sometimes gave approval for raises outside the pay band salary ranges of an employee.   (App. 151-52).

**F. Individual Contributor Talent Reviews, Influenced by Fawkes and Moore, Determine Promotability and Their Reviews Deem Drechsel not Promotable.**

22.     Despite his good reviews and high level work, Drechsel was categorized as unpromotable. In addition to annual evaluations, Claims Team Managers performed Individual Contributor Talent Reviews on the Claims Specialists annually which were submitted to Moore. (App. 159-61). Moore reviewed them and had one-on-one discussions to discuss them (App. 161). Moore reviewed them with the Claims Team Managers and discussed employee development opportunities and relative strengths and weaknesses, and sometimes discussed future roles with the company. (App. 160). Moore could make changes to the individual contributor talent reviews if he felt it was warranted (App. 156), and the individual contributor talent review scores could play a part in determining promotions. (App. 158-59).

23.     The scores given Drechsel in his 2012 Individual Contributor Talent Review, which were influenced more by Moore, were lower than the good scores given him in his annual evaluations. (App. 468-69).   In 2012, Drechsel was labeled as "not ready" for promotion, as having "limited potential" for movement, and as a solid performer "not likely to develop further." (App. 468-69; 471; 473). This determination was contrary to Drechsel's annual performance evaluations, which showed that he satisfied each item on the move readiness employee checklist;

had been in his current position over twelve months; made a business impact; maximized learning within the role; earned a meets expectations for the past two performance reviews; indicated an interest in taking on new or more challenging assignments; and was a retention risk if movement was not offered. (App. 473).[14] 15

24.     The individual contributor talent review affected whether or not the employee gets promoted, and Moore admits that for a move from Grade 12 to Grade 13 it would play a bit of a role. However, he testified that promotions were mostly impacted by whether the person posted for a position; interviewed for a position; was delivering good results in their current position; was continually developing themselves; and had the technical skills and desire to advance. (App. 158). Moore admits that Drechsel was delivering good results. (App. 149).

**G.   Liberty readily promoted Drechsel's younger, less qualified comparators, in some cases with no formal position opening, job posting or evidence of a business need.**

25.     Claims Team Managers had the authority to promote employees with the approval of Moore. (App. 679-80).   Fawkes testified unequivocally Drechsel would not have been able to receive any sort of promotion from a Specialist II to a Specialist III without there being an open position. (App. 260).   However, there is no documented evidence of any prohibition against promoting based on merit without formal posting of positions, and the "Safeco Claims Promotional Guidelines" used at the company does require formal posting of positions. (App. 502). Drechsel had always been approached by his supervisors and received merit based

---

[14]   This form, if filled out by Fawkes and/or Moore for Drechsel in year 2012, was not produced by Defendant.
15 Notably, the guide to assessing potential for move readiness states what is being assessed is "the employee's potential to move significantly within the same segment (*beyond* the next professional level)," so even Moore's assessment did not necessarily indicate that Drechsel was un ready for movement *to* the next professional level of Senior Claims Specialist. (App. 472).

promotions in the past, without having to apply and without a business need for an opening. (App. 88).

26.     Claims Specialist II is a Grade 12 position and Sr. Claims Specialist was a Grade 13 position. (App. 139-41). Moore claimed that for there to be a promotion from grade 12 to 13 there would have to be a determination a Grade 13 position was needed and it would then be posted and interviews conducted. (App. 140-41). However, Moore admitted it was possible that there were promotions from Grade 12 to Grade 13 without the posting of positions in the years between 2008 and 2011. (App. 144-45).

27.     When he requested promotion to Sr. Claims Specialist, Drechsel was continually told there were no openings. (App. 87).   Addicks falsely asserted in her deposition that all promotions were the result of a position posting, interviews, a recommendation and second interviews. (App. 333-34). However, she admits that in February 2010, she requested and Moore approved, a promotion for Edna Menard ("Menard"), who is ten years younger than Drechsel, to Specialist III (title used interchangeably with Sr. Claims Specialist I), along with a raise and subsequent merit increase.   The position was not posted.   (App. 474-477; 577; 605-607)[16] At a score of 110, Drechsel had much higher performance for 2009, as compared to a 103 for Menard, which had even fallen six points from her 2008 score of 109.   (App. 441; 476). Moreover, in 2009, as noted above, Addicks stated in Drechsel's review that "Overall Reinhard's performance was outstanding." Finally, there is no evidence that there was any particular volume of work to justify the promotion in Menard's case, and no evidence Drechsel was considered for this position. (App. 500-02).   At the time Menard was promoted to Sr. Claims Specialist I in February 2010, there

---

[16] Moore claimed not to remember whether he approved this promotion.   (App. 177).

were three persons in this position, who were earning salaries of $64,000; $67,464; and $66,151. (App. 474).   Upon promotion, Menard received an 11% raise, followed by a 4.5% merit raise one month later and a 3.5% raise in 2011.   (App. 607).   While Menard was still making less than Drechsel, she had less experience than him (App. 476; 721-22), and had no greater certifications or achievements. (App. 476).

28.     In addition to the apparent informal merit based promotion of Menard to Sr. Claims Specialist I in early 2010 there was another such opening that was posted and closed during Drechsel's four and a half week FMLA leave period in July 2011. (App. 479-80).   No one advised Drechsel of the opening while he was on FMLA leave.   (App. 89; 722). Amanda Stults, 22 years younger than Drechsel, was hired for the position. (App. 480; 577; 599). Steve Perkins ("Perkins") was the hiring manager for the position and formally announced the promotion. (App. 481; 505). Stults had been with Liberty Mutual for only four years and had no prior experience as an adjuster. Stults clearly had far less experience than Drechsel and there is no indication she had any more certifications or achievements than him. (App. 481-88; 505). Her only achievements were having worked in the large loss claims unit handling catastrophe large loss claims, and currently working moderate regional claims, and Drechsel had greater experience in all these areas. (App. 485, 721-22)   Upon promotion, Stults received a 7% raise, followed by another 11% increase in April 2012, bringing her up to $68,730.   (App. 603).

29.     Two months after Drechsel's constructive discharge, Liberty promoted two significantly younger, former Claims Specialist IIs to Sr. Claims Specialist I, Kent Stiles ("Stiles") (28 years younger than Drechsel) and Susan Gregory ("Gregory") (15 years younger than Drechsel). Stiles had only been with the company for eight years, six of which were spent in the

field as opposed to in inside property. (App. 506; 581). At the time of the promotion, Stiles had "no self-development at all," and he "focused too much on the metrics when asked what he needed to work on." (App. 499). Gregory had only been with the company for four and a half years. (App. 506). Gregory had a lack of knowledge of a critical concept (the arson triangle), and a need to move forward with self-development at the time of the promotion. (App. 499).   In fact, Drechsel had helped train Gregory. (App. 175).   Upon promotion, Stiles received a 6.9% raise to $63,450, and Gregory received a 7.9% raise to $62,400.   Gregory's salary was $69,200 in her Sr. Claims Specialist I position by April 2015, and Stiles was making $77,200 by June 1015.   (App. 174; 565; 570; 656; 660).

30.     Addicks admits that in regard to technical skills, on-the-job experience, and handling types of claims, and working toward AIC certification, Drechsel had equal qualifications as Gregory at the time that she was promoted. Drechsel was working toward AIC certification. (App. 346-47; 721). Addicks does not dispute that the technical skills of Drechsel were as good as those of Gregory and Stiles, and that he could be assigned challenging work without complaint. (App. 348-49, 351).[17]

31.     Sr. Claims Specialist positions were opened, and Claims Specialist IIs were promoted into these positions, in 2010, 2011 and 2012. In April 2013, another Senior Claims Specialist I position was opened and Alisha Sommers, a substantially younger Claims Specialist II, was promoted. (App. 511; 560; 579). Sommers had far less experience than Drechsel and had only

---

[17]  Addicks testified that Drechsel was fit for promotion in terms of his technical skills but that he "lacked ongoing development."   Plaintiff disputes that he lacked ongoing development but even were that true, so did Stiles, as admitted by Liberty.   (App. 349-50; 499).   Addicks admits she knew that at some point Drechsel was studying for a part of the AIC certification because he attended the AIC certification course she was teaching.   (App. 353).

been with the company for five years. While her achievements did include passage of AIC exams, passage of such exams was not required for promotion as evidenced by the former promotion of Stiles who lacked any self-development at all. (App. 493; 499). Fawkes does not even know which of his subordinates have AIC certifications and which do not. (App. 304).   Liberty has not revealed what raise Sommers got upon promotion.   (App. 616)

32.     Liberty made promotion decisions for Sr. Claims Specialist I positions by consensus, or by mere recommendation and approval as in the case of Menard. (App. 337). In making promotions decisions Moore has consulted the candidate's former supervisor and supervisor in their current position. (App. 173).   Moore approved the promotions of Menard, Stults, Gregory, Stiles and Sommers.   (App. 163; 169-70; 408; 474).   Addicks had input into the promotion of numerous employees to Sr. Claims Specialist, including Amanda Stults, Menard, Stiles, Gregory and Sommers (App. 335-56; 478, 497-98; 509-10; 691).

**H.   In 2012, Drechsel's workload continues to be unreasonable and unequal to that of his peers, and he complains about a negative and abusive work environment and being set up to fail.**

33.     In January and February 2012, Drechsel was assigned the most new claims of any of his eleven Claims Specialist II peers, with seventy-one new claims in January (five more than the peer who received the next most new claims), and ninety-one claims in February (eleven more than the peer who received the next most claims). (App. 462; 682-89; 717). In April, he was assigned one hundred thirty new claims, with only two of his eleven peers receiving more new claims assignments than him that month. (App. 462; 682-89; 717).18 Though the workload was

_____

18 In his declaration (LM App. 194-195), Mark Andracsek represents that this same document (RD App.462) is a record of claims closed by each specialist in 2012, but that clearly contradicts both the testimony of Fawkes and the record of new features (claims) received by Drechsel in January, February and March 2012 as reflected in his

extremely heavy, he did a good job of managing it. For example, for weeks March 13 – 27, he started with by far the most pending claims and reduced his load by 38 claims, more than anyone else, which Fawkes admits was a good thing. (App. 284-85; 463).   By June 2012, Drechsel's claims load had reached a level of 180 to 225 pending claims including numerous additional new claims being constantly added. (App. 717). Fawkes admits this is in excess of normal pending claims assignment numbers.   (App. 317-18).

34.     On May 3, 2012, Drechsel complained to Fawkes that he felt he was being set up to fail because the work load was not manageable, and that the environment that he was working in was negative and abusive. Drechsel stated that he could not take much more of the abuse and was willing to contact an attorney if necessary, and he may have communicated the level of anxiety it was causing. (App. 26; 64-65; 407). He believes his complaint was overheard because it took place in an open cubicle and there was hardly any privacy. (App. 82). Fawkes documented the complaint and also talked to Moore about it. (App. 271; 407).[19] He does not recall what he and Moore discussed but thinks that Moore may have told him to go to Human Resources, and subsequently. Dwayne Ayler in HR told him to document that they had the conversation. (App. 270-72).

35.     Drechsel's new claims assignments dropped in May. However, four days following Drechsel's complaint, on May 7, 2012, Fawkes began sending file reviews to Drechsel requesting status updates on particular claims. (App. 412; 462). On May 8, 2012, Fawkes counseled Drechsel regarding his year to date volume and customer service scores and documented it. (App. 408). On May 30th and again on June 1st, Fawkes sent emails harassing Drechsel regarding his progress with

scorecard (RD App. 717).
[19]  Moore does not recall Fawkes talking to him about it but states that Fawkes would have done so.   (App. 220). Moore testified that this could have been the time when Fawkes told him Drechsel threatened to get an attorney involved. (App. 220).

license applications. (App. 409). Again on Saturday, June 2nd, he sent Drechsel an email admonishing him to address some issues with his claims diary. (App. 413). Fawkes claims not to recall having sent such emails and admits that he does not have examples of such emails from any other time during Drechsel's employment. (App. 292-93).

36.     Fawkes would have discussed any performance problems of Drechsel with Moore. (App. 279). Initially, Moore testified Fawkes may have discussed the issues that were the subject of these emails with him (App. 222-28), but on later questioning by Liberty's counsel, Moore changed his testimony to state unequivocally that he had not had these conversations. (App. 229-30).

## I.   The work environment causes Drechsel to collapse and he takes medical leave June 5, 2012 through July 2, 2012.

37.     Since near the end of 2011, Debbie Koenig ("Koenig"), Drechsel's domestic partner of eleven years at the time, observed Drechsel began curtailing his normal activities and was a "nervous wreck." He was nauseated and routinely threw up before work, paced, was not sleeping and appeared depressed for approximately six to eight months prior to his discharge. (App. 64; 710-713).

38.     On Monday, June 4th, Drechsel fainted at his desk due to the stress from work, and went to the doctor. (App. 62-63).[20] Drechsel reported being under a lot of stress due to the increase in his volume of work, being overloaded with pending claims with new ones being added every day, and being concerned Liberty was trying to run him out of the office. He reported nervousness and morning nausea, and scored within the range for depression. He was prescribed Lexapro for depression and Ativan for anxiety and insomnia. Drechsel was placed on leave from June 4, 2012

---

[20]   Fawkes claims not to recall this. (App. 293-94).

to July 2, 2012 and applied for short term disability. (App.399; 415-16; 464-65). Drechsel went on FMLA leave beginning June 5th and while on leave applied for short term disability. He returned to work on July 2, 2012.   (App. 417; 466).

39.     While on leave Drechsel complained to his former supervisor Summerlin that he believed Liberty was doing this to him because of his disability and in retaliation for the amount of medical leave he had taken. (App. 83-86). Moore sometimes consulted with Summerlin on claims files and he and Summerlin subsequently discussed how Drechsel was doing. (App. 127).

**J.   Prior to Drechsel's discharge Liberty was on notice of Drechsel's need for FMLA leave due to a serious health condition.**

40.     Drechsel provided notice to Liberty on June 5, 2012, and on June 19, 2012 Liberty advised him that his disability absence would be counted toward his FMLA leave allotment. (App. 414-15). Since Drechsel had applied for short term disability, Liberty did not require him to submit a FMLA medical certification pending determination of his disability claim (App. 415), and he did not do so because he was constructively discharged after he was denied the short term disability. (App. 76-77). Although Fawkes initially denied knowing that Drechsel's leave had anything to do with medical issues (App. 294-95) and that he was out sick, he later admitted he did know. (App. 129; 303).

**K.   Liberty failed to follow its own policies during Drechsel's medical leave.   Harassment continues upon his return, culminating in his discharge.**

41.     When Drechsel returned from his leave on July 2nd, it appeared there was no change to the unreasonably heavy volume of his claims load and the unequal distribution of claims. (App. 723). Because he was out more than three weeks there should have been a suspension of new claims assignments to him, but there had not been. Indeed, Liberty's records

reflect he received 41 new claims in June. (App. 37; 211-12; 301; 462). Moore even testified that when someone is out on an extended leave they may completely reassign all of their pending claims. (App. 214-15).

42.    When Drechsel returned he reminded Fawkes that he had had some serious health issues.   (App. 5). Drechsel could tell by Fawkes' actions and sharp tone of voice that he had a bad attitude about Drechsel having been out on leave and was angry about it. He had his back turned to Drechsel and refused to look at him when he was speaking. (App. 78-80).

43.    Fawkes testified he did not know whether he did anything to help with Drechsel's claims load while he was out in 2012, such as assign a backup, bring in a new specialist or hire a temporary employee. (App. 299-300). Fawkes does not dispute that he failed to transfer claims from Drechsel. (App. 248). Upon his return Drechsel had an inordinate number of emails with attachments that needed to be posted to the file, and was told he had two days to complete them. (App. 67).   Typically when a Claims Specialist was out a backup employee or their manager checks their emails and Drechsel had served as a backup in this capacity for others, where he would answer their calls, address their files, check their email and make sure there was nothing important that was not put in the file. (App. 68; 215). While Drechsel was out, some notations had been made in his files indicating some calls had been taken, but some files had not been attended to and there was no indication that his emails had been checked. (App. 69-70).

44.    Upon return from FMLA leave, Drechsel again complained to Fawkes about the claims load. Fawkes replied that the system is broken, you didn't sign up for this, and you should find another position. (App. 24-25; 71). Fawkes admitted he talked to Drechsel about seeking other opportunities and he cannot deny that he may have told him to look for another job. (App. 296-98).

Fawkes subsequently sent Drechsel emails saying certain files needed attention immediately and Drechsel responded that he was doing the best that he could. (App. 80).

45.     By this point, Addicks had on two occasions told Koenig that Drechsel was too old, can't handle this, and needs to find another job. The first was at a happy hour in approximately January 2012, and the second was at an Independence Day party at the home of Addicks on approximately July 5, 2012. (App. 697-699; 700-701).[21]  Koenig had relayed these conversations to Drechsel and he was visibly baffled, agitated and upset. (App. 702-703).

46.     At the Independence Day party at the home of Addicks on approximately July 5, 2012, Moore said to Drechsel words to the effect that Drechsel did not like what he was doing at Liberty. Drechsel interpreted that to mean that he knew of his dissatisfaction with being passed over for promotions and raises in favor of younger employees and the unreasonable and unequal workload. (App. 723). Moore denies the comment. (App. 215-16).

47.     On or about July 9, 2012, Drechsel received notice that Liberty Mutual had denied his claim for short term disability benefits and said he needed to repay the temporary benefits. (App. 419; 420-22).22 Fawkes received this notification as well. (App. 423). The denial and request for repayment of benefits, combined with other factors including the workload, stress, anxiety and frustration, caused Drechsel to tell Fawkes that he could no longer work for Liberty due to his unreasonable and unbearable workload and feeling he was being set up to fail. (App. 72-73; 674-675; 677).    Drechsel told Fawkes that he would be hearing from his legal

---

[21] Addicks admits that there was a discussion about the stress of the job with Koenig at the Independence Day party. (App. 359).
22 Liberty Mutual had garnered Drechsel's medical records in determining the claim, and cited them in the denial letter, so they were aware of the anxiety, depression and other physical problems Drechsel attributed to the workload. (App. 419-422).

representative in regards to this. Fawkes said he would be surprised to see how this turns out and that he was going to go tell Moore and did not try to talk Drechsel out of leaving. (App. 73; 273).[23]

48.     Drechsel believes his need for medical leave in June 2012 was caused by the age and disability discrimination conduct to which he was being subjected at Liberty, including the economic harm of repeatedly not being considered for a promotion or appropriate raise and feeling he was being set up to fail by being given an unequally heavy workload. The comment from Fawkes when he returned from medical leave that he should look for another position, and his and Addicks' recent comments that he was too old, caused Drechsel to feel his environment of the workplace was unreasonable and unbearable and one in which he could not continue working. (App. 723).

49.     That afternoon, Fawkes reported to the management team that Drechsel decided to pursue opportunities outside of the company. (App. 425). That day Drechsel left a message for Moore's supervisor Breor because he wanted to talk to him about what had transpired, but Breor did not return his call.   (App. 6-7).[24] He also talked to his former supervisor Summerlin and indicated that he could not take the pressure of the overload of work and denial of disability, and could no longer work for Liberty, and Summerlin seemed disappointed that Liberty would lose Drechsel. (App. 74).

**L**.   **Plaintiff's receipt of a retaliatory and threatening item in the mail from Liberty following his discharge**.

50.     Liberty mailed Drechsel's personal property by mail to his home following the constructive discharge. Lying on top of the box with his personal property was a horse head puppet

---

23  Fawkes admits Drechsel seemed upset but denies that Drechsel told him why he was leaving.   Fawkes does admit that Drechsel said they would be hearing from his attorney. (App. 276-78).
24  Moore informed Breor that Drechsel had resigned. (App. 132-33).

with a noose around its neck that did not belong to Drechsel.[25] Drechsel felt very threatened and offended and Koenig called the company's human resources department about it.   (App. 98-100; 709).26

51.     HR employee Ayler questioned Moore regarding the puppet following receipt of the call from Koenig, but he was not counseled about the puppet being sent to Drechsel and to his knowledge no one was told it was inappropriate or impermissible. (App. 189-90).   Moore claimed he saw the puppet (without the noose) in Drechsel's cubicle, and had also seen it hung by the noose hanging on the outside of Drechsel's cubicle (App. 190-94). Moore said he told Drechel to take it down and that he specifically said: "you can have horse head and a noose, but you can't have a horse head in a noose." (App. 196). Moore claims at that time he did not ask Drechsel whose puppet and noose it was and did not investigate to find out who hung it outside of his cubicle. (App. 195; 197-98). Drechel denies Moore made this statement to him and in fact Drechsel had never seen the horse head puppet hanging in or anywhere in his cubicle .(App. 101).

52.     Fawkes also claims he had seen the noose puppet hanging outside of Drechsel's cubicle, but admits he did not report it or investigate to determine whether someone had put it there. (App. 309-10).[27] Fawkes packed the horse head puppet in a box and mailed it to Drechsel, and was not criticized for doing so by HR. (App. 313-14). Fawkes does not recall having any anti-discrimination training at Liberty and does not even know whether the company has an

---

[25] He had seen the horse puppet in the cube of his coworker John Vandesteeg. (App. 98-100).

[26] Koenig was present when Drechsel opened the box from Liberty and saw the puppet.  He exclaimed, "Oh God" and was upset and disturbed, and they called Human Resources at Liberty to report it. (App. 707-708).

27 Fawkes testified he did not hang the puppet on Drechsel's cubicle.   (App. 319).

anti-harassment or anti-retaliation policy. (App. 311-12).28

**M. Younger hires by the discriminating officials.   Younger employees absorbed Drechsel's work.**

53.     Liberty hired younger workers into Addicks' and Fawkes' units including Ablorh and Jarboe in 2009 and Hopkins in 2011. (App. 340; 568; 579).   Liberty promoted Sommers to Claims Specialist II in late 2010.   (App. 561).   Liberty asserts that it did not hire anyone to replace Drechsel and that his claims were distributed to other employees throughout the Inside Property Claims Department in Richardson, Texas.   (App. 579).   All Claims Specialist Is and IIs but Tyressa (Sue) Brown were younger than Drechsel.   (App. 579, 581).

**N.   Age Animus Expressed to Drechsel's Wife, and his reaction to the workplace discrimination.**

54.     Drechsel complained to Koenig about being overloaded with claims while he was employed at Liberty.[29] He said he could not keep up the amount of claims that he had, that others were not being similarly overloaded, and that he thought they might be doing it to try to "break him." He also told her about the age related comment of Fawkes that was "too old" (App. 385-88; 695-696).

55.     On the day of his constructive discharge Drechsel told Koenig he had quit his job because he could not take it anymore and felt they were pushing him out. (App. 704). He indicated that due to the background with Fawkes, the workload, then opening his computer and seeing that his claim for disability had been denied, had all caused him to quit. (App. 705-706).

---

28 Addicks did not see the puppet in Drechsel's cubicle or hanging on his cubicle (App. 366-67), but admits that it would be offensive should have been removed from the workplace pursuant to the harassment policy at Liberty. (App. 375-76).
29 Drechsel and Koenig have lived together since 2001. (App. 384; 389-90).

**O.**   **Jennifer Meade, Brandi Moore and other instances of FMLA retaliation.**

56.   Claims Adjuster Jennifer Meade experienced a significantly higher claims load and one that was greater than that of her coworkers when she returned to work following FMLA leave in October 2012.   She was in pain during that time but did not miss work.   In November 2012 her supervisor and his manager told her to take medical leave or be terminated, and feeling pushed out by the company following her leave, she resigned in December 2012.   Meade had had reported to Moore and Addicks in their unit between 2008 and 2009, and they made comments to the effect that if an employee does not produce, they will find a way to get rid of them.   Meade perceived the claims overload as a tactic to induce her to leave the company.   (App. 724-725).

57.   Brandi Moore ("Moore"), another Claims Specialist was terminated following a performance issue having to do with absenteeism (App. 179; 181-82), and Andy Moore was involved in discussions around potentially terminating Moore with Perkins and HR and possibly Breor. (App. 178-80). Perkins was Brandi Moore's supervisor and was upset she was on medical leave and could not handle claims.   (App. 105-07).

58.   Claims Specialist Laurie Zimmerman had gone out on medical leave and she was terminated for performance at some point after she returned from leave. (App. 57-59; 693-694).

**P.**   **Other evidence of discriminatory animus toward Plaintiff.**

59.   Moore's supervisor Breor made derogatory statements toward Drechsel that made him think he wanted him out of the company.   About two months before his discharge, they were in an elevator together and he said to Drechsel, "I don't want to stand next to this guy." When Drechsel asked why, Breor did not respond. It did not seem like a joke to Drechsel. (App.

17-19).30 In February 2012, Breor announced his intent to give Bravo awards to thirteen of Drechsel's peers because customers had called them out by name in CLF surveys over the prior two weeks for great customer service. Breor intentionally overlooked Drechsel for a Bravo award, admitting only when Drechsel called it to their attention that he, too, was named in the comments of a survey. (App. 426; 428).

60.     On a couple of occasions, Moore had been unhelpful to Drechsel when he approached him on some claims. (App. 13). Moore attended a surprise birthday party for Drechsel. He initially testified that he did not attend and did not know that Drechsel had turned 60 just before he left Liberty, but upon further questioning he admitted recalling Drechsel's birthday cake having a "60" on it.  (App. 187-88; 205). When Drechsel returned from his FMLA leave related to the detached retina, Moore put fake eyeballs all around his keyboard on his desk, which was offensive to Drechsel as the detached retina had been a traumatic experience. (App. 96-97; App. 726). Moore admits doing this and that he knew Drechsel had been out for a detached retina but denies his conduct violated workplace harassment policies or was even inappropriate.   (App. 216-18).  Moore, Breor and Fawkes referred to Drechsel as "Pirate" because of his eye patch. Drechsel was bothered and upset by this, and over time appeared to coworkers to be increasingly depressed.  (App. 726)

61.     Breor, Moore, Addicks and Perkins made comments to the effect that Drechsel was "too old," should be retired and needs to retire.  (App. 725)  Before his termination, Drechsel learned that some of his new claims file assignments were coming from Unit Manager Perkins, who was significantly younger than Drechsel and had told Claims Specialist Sommers in 2011 that

---

30 Breor had asked Meade if she and Drechsel were romantically involved, and also referred to her as a Barbie Doll and trophy wife on another occasion.   (App. 726)

Perkins told her Liberty needed to get rid of all of these "old employees" and hire people right out of college. (App. 103-04).

62.     Subsequent to Drechsel's constructive discharge, Summerlin told him that six people who were younger than him were hired in St. Louis. The St. Louis office and the Dallas office work together and some claims representatives rotated between the St. Louis and Dallas offices. (App. 74-75).

63.     Drechsel overheard statements from supervisors that we can make life very difficult for you by assigning you a lot of claims. One of those supervisors was Addicks.   Even when she was no longer his supervisor, she still occasionally assigned claims to him. (App. 60-61).

## I.     ARGUMENT AND AUTHORITIES.

### A.   Drechsel's Pay and Promotion Claims are not Time Barred.

Defendant asserts that Drechsel's failure to promote or pay claims that arose before March 10, 2012 (which is 300 days before his January 4, 2013 EEOC charge filing), are time-barred. (D.'s Br. at 16). Dreschel, however, does not assert that promotion or pay claims before that time are actionable. However, evidence of pay and promotion discrimination before March 10, 2012, is still proper background evidence in support of Drechsel's claims. Conduct that is not timely so as be the basis of a claim may still constitute relevant background evidence to a pending claim. *United Air Lines v. Evans*, 431 U.S. 553, 558 (1977); *see also*, *AMTRAK v. Morgan*, 536 U.S. 101, 113 (2002) (Title VII does not "…bar an employee from using the prior acts as background evidence in support of a timely claim"); *Cortes v. Maxus Exploration Co.*, 977 F. 2d 195, 199-200 (5th Cir. 1992) (time barred acts of discrimination are relevant to the issue of harassment); *Ramsey v. Henderson*, 286 F. 3d 264, 268 (5th Cir. 2002) ("[d]iscriminatory incidents outside of the filing

period may be relevant background information to current discriminatory acts"); *Everett v. Cent. Miss., Inc., Head Start Program,* 444 Fed. Appx. 38, 45 (5th Cir. 2011) (although only those acts occurring within 180 days of the charge filing were actionable, acts outside of the charge filing period may be used as background evidence in support of a timely claim); *Rutherford v. Harris County,* 197 F. 3d 173, 186 (5th Cir. 1999) (evidence relating to a matter not being litigated because it was beyond the scope of the plaintiff's EEOC charge is still relevant to proof of discrimination). Thus, Drechsel's evidence of age discriminatory conduct before March 10, 2012, is relevant background evidence, as is evidence of pay and promotion discrimination before that date.

B.  **Dreschel Establishes a Prima Facie Case of Age and Disability Discrimination under the ADEA, TCHRA, and ADA**.

Dreschel asserts age discrimination claims under the ADEA and TCHRA, and a disability claim under the ADA.

1.  **Dreschel Establishes a Prima Facie Case of Age Discrimination in Regard to Compensation and Promotion**.

Liberty initially asserts that Dreschel cannot establish a prima facie case of age discrimination because he cannot establish an adverse employment action. (D.'s Br. at 18). Liberty first argues that Drechsel's claim that he was assigned a heavier workload than younger peers is not an adverse employment action. Dreschel, however, does not assert that the heavier workload, standing alone is sufficient to constitute a materially adverse action; instead, as asserted *infra*, he argues his heavier workload is relevant to prove pretext and as a basis for his constructive discharge. Dreschel complained numerous times that he was being given substantially more work than his co-workers and that it seemed targeted at trying to get him to leave, but the situation was not remedied, and this is relevant background evidence of discrimination and retaliation.

a.   <u>**Drechsel Establishes a Prima Facie Case of Compensation Discrimination**</u>.

Liberty next asserts that while a denial of a merit raise may sometimes constitute a materially adverse action, Dreschel cannot establish a prima facie case of pay discrimination because he cannot show that he was paid less than a similarly situated employee outside of the protected class for work requiring substantially the same responsibility. (D.'s Br. at 20). Liberty asserts Dreschel must show he was treated differently than a "nearly identical" comparator. (D.'s Br. at 31). That mistakes Drechsel's burden. This circuit has recently held that to establish a prima facie case of wage discrimination under Title VII, a plaintiff must show that he was a member of a protected class and that he was paid less than a non-member for work requiring substantially the same responsibility. *Fields v. Stephen F. Austin State Univ*., 611 Fed. Appx. 830, 831 (5th Cir. 2015); *Pittman v. Hattiesburg Municipal Separate School District,* 644 F.2d 1071, 1074 (5th Cir. Unit A 1981).   *See also*, *Johnson v. TCB Construction*, 334 Fed. Appx. 666, 670 (5th Cir. 2009) ("To establish a prima facie case of discrimination with respect to compensation, the plaintiff must show that he was paid less than a member of a different race was paid for work requiring **substantially** the same responsibility)."   Thus, Dreschel must show that those workers to whom he compares himself were "performing substantially the same job." *Uviedo v. Steves Sash & Door Co*., 738 F. 2d 1425, 1431 (5th Cir. 1984). The case cited by Liberty, *Taylor v. United Parcel Serv. Inc*., 554 F. 3d 510, 523 (5th Cir. 2009), if read to hold as Liberty asserts, incorrectly sets forth the standard utilized in numerous cases in this circuit, including the decision in *Uvideo*. One appellate panel, however, may not overrule a decision, right or wrong, of a prior panel, absent en banc reconsideration or a superseding contrary decision of the Supreme Court   *Miles-Hickman v. David Powers Homes, Inc*., 613 F. Supp. 2d 872, 887, n. 22 (S.D. Tex. 2009), and thus *Taylor*

cannot change long standing precedent in this circuit regarding the standard to establish pay compensation. Taylor, however, should more appropriately not be read to require a prima facie case be requiring proof the plaintiff and comparators worked under "nearly identical circumstances" because this misreads Taylor. As the court stated in *Jones v. Chevron U.S.A., Inc.*, 932 F. Supp. 2d 794, 796 (S.D. Tex. Feb. 12, 2013), stating that the Taylor now requires a different formulation of the prima facie case is a "misreading" of the case and that Taylor could not have intended "to silently overturn the quarter-century's worth of prima facie case precedent." This Court should therefore find the "nearly identical" language in Taylor is not an appropriate basis for establishing discrimination in compensation.

Liberty's argument that Drechsel's claim fails because he cannot show he was paid less than other Claims Specialist IIs misses the point, as Drechsel asserts that he was doing the same level of work as Sr. Claims Specialist I and should have been compensated at that level. Drechsel's evidence establishes he did work at this level and he further presents evidence that he was being paid less than younger Sr. Claims Specialists. Drechsel handled large loss claims that were severe in complexity (App. 721-22). Like Sr. Claims Specialists, Drechsel handled high dollar claims over $50,000and those where the property was not livable (App. 142-43; 721-22).   Drechsel was simply being given more difficult work that other Claims Specialists II, and the work he did was comparable to that handled by Sr. Claims Specialists. That Liberty recognized he was doing such work is supported by the fact he would formally be reassigned work of Sr. Claims Specialists who went on leave or left the employment of Liberty. (App. 10-11; 34-36; 108-10; 331-32).

Dreschel was earning less than substantially younger Sr. Claims Specialist employees with less tenure, qualifications or experience. As of April 2012, the substantially younger Stults, was

making $68,730, more than the $64,327 salary being paid Drechsel, in her new Sr. Claims Specialist position. (App. 399; 603).[31] All of the persons promoted to Sr. Claims Specialist in the 2010-2012 timeframe at Liberty were substantially younger than Drechsel and had less tenure, experience and qualifications than Drechsel. (App. 174-75; 441; 476; 481-88; 485; 499; 500-502; 505; 506; 565; 570; 577; 579; 581; 656; 660; 721-22;    The evidence shows that these promotees were given raises of anywhere from 6.9% to 11% upon promotion into their Sr. Claims Specialist positions, and some were even quickly eligible for merit raises.   (App. 565; 570; 603; 607). This circuit has held that the analysis is the same for a compensation discrimination claim even where two employees whose salaries are being compared are employed at different times in the same position. *Uviedo*, 738 F. 2d at 1431. Where the plaintiff establishes that persons outside the protected class were earning greater compensation performing work with substantially the same responsibility, a prima facie case is established. *See e.g., Gerald v. Univ. of S. Miss.*, 2014 U.S. Dist. LEXIS 5019 (S.D. Miss. Jan. 15, 2014) (prima facie case established where female plaintiff showed she was performing the same job as a male, but making $9,000 less per year); *Reynolds v. Encore Wire Corp.*, 2011 U.S. Dist. LEXIS 31190, *6, 9 (E.D. Tex. March 24, 2011) (summary judgment denied where female showed paid less than male on ground factual disputes existed as to whether she performed substantially similar work as males). Dreschel shows that substantially younger Sr. Claims Specialists were paid more for performing work with substantially the same responsibility, and he therefore establishes a prima facie case.

---

[31] Although there were some substantially younger Sr. Claims Specialists who were earning similar to or less than Drechsel, they are not comparable as they had far less tenure, qualifications and experience, including Menard. (App. 721-22; 441; 476). Notably, to establish a prima facie case of compensation discrimination the plaintiff need only establish a single instance of disparate pay, and not that all comparators are paid more. *Jones*, 932 F. Supp. 2d at 796-97.

**b.   Dreschel Establishes a Prima Facie Case of Discrimination in Promotion**.

Liberty further asserts that Dreschel cannot establish a lack of promotion is a materially adverse action so as to establish a promotion claim, because he did not apply for promotion. (D.'s Br. at 23). Materially adverse employment actions include failure to promote.   *Breaux v. City of Garland,* 205 F. 3d 150, 157 (5th Cir. 2000), *citing Pierce v. Texas Dep't of Criminal Justice, Institutional Div.*, 37 F. 3d 1146, 1149 (5th Cir. 1994). Generally, when discriminatory promotion is alleged, the plaintiff must prove: (1) that he was not promoted; (2) that he was qualified for the position sought; (3) that he was within the protected class at the time of the failure to promote; and (4) either the position he sought was filled by someone outside the protected class or he otherwise was not promoted due to race or age. *See Blow v. City of San Antonio*, 236 F. 3d 293, 296 (5th Cir. 2001), *citing Tex. Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253-254 (1981).   A plaintiff need not show they "sought" or applied for a position if applications are neither sought nor accepted for promotions to certain positions. *See Hernandez v. City of Corpus Christi*, 820 F. 2d 781, 797 (S.D. Tex. 2011). *See also, Fuller v. General Cable Indus.*, 81 F. Supp. 2d 726, 730 (E.D. Tex. 2000) (rejecting argument that general expressions of interest in being promoted are insufficient to establish a prima facie case where no formal application is required to be considered for a promotion).

Drechsel was age 57-60 when he applied for promotions and was thus within the protected class. (App. 721).   Drechsel further presents evidence that he was qualified for the Sr. Claims Specialist position because he was already performing work that persons in this position were doing, as noted supra.   Drechsel further produces evidences that he discussed on many occasions a desire to be promoted and that no promotion was given. Specifically, Drechsel began requesting

promotions in 2009 and he continued to seek promotions each year, including in April 2012, but was told again and again there were no openings and he was not promoted. (App. 90, 257; 258-62; 722).   Liberty asserts Drechsel cannot establish a prima facie case because it posted only one position from June 2010 to July 2012, in mid-2011 and Drechsel did not apply. (D.'s Br. at 23). Liberty posted this position during Drechsel's FMLA leave (App. 479-80), which Drechsel believes was purposefully done so he would not be aware of the position to apply. (App. 722-23). No one advised him of the posting despite his having expressed interest in being promoted to that very position just 3 months before; as such it can fairly be said that Drechsel did seek this position that was posted . (App. 89; 722-23).   Liberty instead hired Stults, who was 22 years younger than Drechsel and had far less experience and qualifications. (App. 480-488, 505; 577).   While the failure to this specific posted position is time-barred, it still constitutes background evidence that the failure to promote Drechsel in 2012, was due to age.

In regard to the 2012 request for promotion by Drechsel, his evidence shows Liberty gave promotions frequently without an official job opening being posted. The 5th Circuit has held that where position advances were generally just bestowed as part of a career advancing program and not communicated by formal application, the plaintiff's informal communication to his supervisors of his desire to participate is enough for the prima facie case. *Abrams v. Baylor College of Medicine*, 581 F. Supp. 1570, 1579 (S.D. Tex. 1984), *aff'd in part and rev'd in part on other grounds*, 805 F. Supp. 528 (5th Cir. 1986).   Where an employer does not post available supervisory vacancies and uses no formal procedure for selecting candidates for promotion a plaintiff need only show the company had some reason to consider the plaintiff for the position. *Fuller v. General Cable Indus*., 81 F. Supp. 2d 726, 730 (E.D. Tex. Feb. 4, 2000). Where a the

company did not post vacancies, there were no written policies relating to promotions, and sometimes promotions were announced only after they were filled, it would be patently unfair to require the plaintiff to show he formally applied. *Id. See e.g.,, Davis v. Ampco Sys. Parking*, 748 F. Supp. 2d 683 (S.D. Tex. 2010) (where there was a factual dispute about whether a company internally promotes candidates without requiring submission of resume or formal application, fact that plaintiffs expressed an interest in the position to supervisors is sufficient to establish a prima facie case); *Stewart v. State Div. of Medicaid*, 2014 U.S. Dist. LEXIS 147966, *3-4 (D. Miss. Oct. 17, 2014) (fact issue is raised that a formal application was not required where plaintiff presented affidavit that she informed her supervisor of a desire to be promoted and employer used informal methods to fill positions).

Here, the evidence demonstrates that there was generally not a formal process at Liberty where employees in the department would have to apply for promotions and that promotions were frequently granted without a formal application process. Company policy does not require posting of positions (App. 502), and indeed Drechsel had always been approached by his supervisors and received merit based promotions in the past without having to apply and without a business need for an opening. (App. 88).  Addicks promoted employee Menard (10 years younger than Drechsel) to Sr. Claims Specialist without formal posting, and Moore admits these information promotions may have occurred. (App. 87; 144-45; 477; 577). Notably, this promotion clearly indicates Addicks falsely asserted in her deposition that all promotions were the result of a position posting, interviews, a recommendation and second interviews. (App. 333-34).

Finally, Drechsel presents evidence of the last prong of a prima facie promotion case - that persons outside the protected class were promoted, or other evidence that he was not otherwise

promoted due to his age. In about March 2012 during his performance review where Drechsel discussed that he felt he should be given a raise, which he testified went hand in hand with a promotion, Fawkes told Drechsel that he would not be getting a pay raise because he was too old and made too much money, and they did not want him there anymore. (App. 14; 22-23; 45; 268-69; 681). Additional evidence that Drechsel was not promoted due to his age include his lack of promotion despite good reviews, which showed that he satisfied each item on the move readiness employee checklist. (App. 158-61, 473); being given a 2012 Individual Contributor Talent Review generally did not reflect the good scores given him in his annual evaluations and which he is labeled "not ready" for promotion, as having "limited potential" for movement and "not likely to develop further" (App. 468-69; 471; 473); Drechsel was given an extremely heavy workload as compared to his peers that seemed designed in 2012 to set him up to fail or get him to quit (App. 317-18; 462; 682-689, 717); and Fawkes began documenting issues with Drechsel's work and sending him harassing emails about his work. (App. 408-09, 413).   Drechsel raises genuine issues of material fact that evidence that he was not otherwise promoted due to his age, and thus establishes a prima facie case.

c. **Dreschel Establishes a Prima Facie Case of Age Discrimination in Regard to Constructive Discharge**.

Liberty asserts generally that any claim by Dreschel regarding constructive discharge must fail as a matter of law because he cannot show he suffered intolerable conditions that would have compelled a reasonable employee to resign. (D.'s Br. at 43).[32]   Drechsel alleges that he was

---

[32]  It is unclear in Defendant's brief if it is requesting summary judgment on all of Drechsel's constructive discharge claims or only in regard to his FMLA retaliation claim. Defendant only refers to Dreschel being unable to establish constructive discharge as to his FMLA retaliation claim. However, Dreschel asserts that constructive discharge as an adverse action in regard to his age, disability and retaliation claims as well.

constructively discharged due to his age and this this circuit has held that constructive discharge constitutes an adverse employment action. *Aryain v. Wal-Mart Stores Tex. LP*, 534 F. 2d 473, 480 (5th Cir. 2008). An employee establishes a case of constructive discharge if they show that the employer made an employee's working conditions so intolerable that the employee is forced into an involuntary resignation. *Young v. Southwestern Sav. and Loan Ass'n.*, 509 F. 2d 140, 144 (5th Cir. 1975). Constructive discharge can be found where an employee resigns, rather than waiting to be fired, because of unreasonably harsh conditions that have been applied in a discriminatory fashion.   *See id.*   In the Fifth Circuit, the following events have been found to constitute relevant evidence that a reasonable employee would feel compelled to resign: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement, or continued employment on terms less favorable than the employees former status. *Brown v. Bunge Corporation*, 207 F. 3d 776, 782 (5th Cir. 2000). [33] While discriminatory failure to promote alone may be insufficient to establish constructive discharge, it can be when combined with other aggravating factors. *Boze v. Branstetter*, 912 F. 2d 801, 805 (5th Cir. 1990).

Drechsel asserts both lack of promotion, supra, and badgering and harassment as a basis for his constructive discharge. Additionally, Drechsel alleges a heavier workload as a ground for his

---

Assuming *arguendo* that Defendant moves for summary judgment on all of Drechsel' constructive discharge claims, Drechsel asserts he has raised genuine issues of material facts to establish a constructive discharge in regard to all of his claims.

[33] Defendant cites to *Brown v. Kinney Shoe Corp.*, 237 F. 3d 556, 566 (5th Cir. 2001), in asserting that constructive discharge requires a higher degree of harassment than a hostile environment claim, however, that case simply indicated that this was the case when a plaintiff was relying on badgering or harassment under the *Brown* factors to support an assertion of constructive discharge.

constructive discharge:

- In January and February 2012, Drechsel was assigned the most new claims of any of his eleven Claims Specialist II peers (App. 462; 682-689; 717), and continued at high levels thereafter;
- By June 2012, Drechsel's claims load had reached a level of 180 to 225 pending claims including numerous additional new claims being constantly added (App. 717), which is in excess of normal pending claims assignment numbers.  (App. 317-18);
- On May 3, 2012, Drechsel complained to Fawkes that he felt he was being set up to fail because the work load was not manageable (App. 26; 64-65; 407) and said he could not take much more of the abuse and would contact an attorney if necessary (App. 26; 64-65; 407);
- Four days following this complaint, Fawkes began sending file reviews to Drechsel requesting status updates on particular claims and stating he was counseling him on his volume and customer service scores (App. 408; 412; 462), and shortly thereafter sent harassing emails to Drechsel regarding his progress with license applications and claims delivery when he had not ever made such criticism to Drechsel before (App.292-93; 409; 413) (App. 292-93);
- On or about July 9, 2012, Drechsel was notified that his claim for short term disability benefits was denied and the temporary benefits would have to be repaid (App. 419; 420-22);
- Concerned about the unreasonable and unbearable workload and beginning of documentation against him, and Addicks comment just days before that he was too old to do his job, Drechsel believed he was being set up to fail and said he could no longer work at Liberty (App. 72-73; 697-701; 674-675, 677; App. 723).

While Brown referenced reduction in job responsibilities, greatly increased responsibilities can also become so intolerable as to support a constructive discharge. *McConnell v. Univ. of Ala. Healthcare Sys.*, 2016 U.S. Dist. LEXIS 101487, * 14 (S.D. Ala. August 3, 2016. So to, courts have held that numerous instances of badgering and harassment can support a finding of constructive discharge. *See, e.g.*, *Garza v. Mary Kay, Inc.*, 2010 U.S. Dist. LEXIS 84586, *17-18 (N.D. Tex. Aug. 17, 2010) (plaintiff's evidence of badgering by supervisors, reduction in responsibilities, being overly scrutinized, being treated in a hostile manner; and being assigned tedious tasks, sufficient to raise issues of material fact regarding constructive discharge); *Chavera*

*v. Victoria Indep. Sch. Dist*., 221 F. Supp. 2d 741, 750 (S.D. Tex. 2002) (numerous statements being made to the plaintiff that a jury could find were not sex-neutral may raise genuine issues of material fact to support a claim of constructive discharge); *Dediol v. Best Chevrolet, Inc*., 655 F. 3d 425, 445 (5th Cir. 2011) (a refusal to transfer the plaintiff to another department when he requested when there were strong tensions between plaintiff and another employee that at one point escalated into a physical altercation sufficient to raise fact issue regarding constructive discharge).

Finally, this circuit has held that if employer actions lead the employee to believe that termination is inevitable, that is sufficient to establish constructive discharge. *See, e.g., Faruki v. Parsons S.I.P., Inc*., 123 F. 3d 315, 319 (5th Cir. 1997) (constructive discharge is established if an employee is told that if they should find another job and that they will be placed on unpaid leave if they fail to do so); *Stephens v. C.I.T. Group/Equipment Financing, Inc*., 955 F. 2d 2013, 1027-28 (5th Cir. 1992) (constructive discharge established where employee reasonably believes that an employer's actions in demoting him were a harbinger of dismissal because he was also questioned when he was going to quit).

Drechsel's evidence that in 2012 there was denial of promotion; a heavy increase in his workload; a refusal to give him a raise due to his age; and the documentation of his performance and badgering emails, was set forth *supra*.  Drechsel also proffers additional evidence of badgering and humiliation, and employer actions that lead him to believe that termination is inevitable, that is sufficient to establish constructive discharge that support a determination of constructive discharge:

- when Drechsel returned from his leave on July 2nd, he still had an unreasonably

heavy volume of his claims load and the unequal distribution of claims (App. 723), and he felt this was designed to encourage him to leave or set him up for performance issues (App. 72-73; 674-675, 677);

- there was no suspension of new claims to him during his leave as was usual when employees were out more than three weeks, and no transfer of claims from him which also often occurred when employees were out on leave (App. 37; 211-12; 214-15; 248; 301; 462);

- Drechsel overheard statements from supervisors, including Addicks, that we can make life very difficult for you by assigning you a lot of claims, and she continued to assign him claims (App. 60-61);

- when Drechsel returned he told Fawkes that he had had some serious health issues. But Fawkes just spoke to him in a sharp tone of voice and acted angry and refused to look at Drechsel when he was speaking (App. 5, 78-80);

- when Drechsel complained about his claims load upon his return from leave, Fawkes said he should find another position (App. 24-25; 71);

- Drechsel learned that some of his new claims file assignments were coming from Unit Manager Steve Perkins, who was significantly younger than Drechsel, and he was told Perkins had said to another employee that Liberty that the company needed to get rid of all of these old employees and hire people right out of college (App. 103-04);

- Addicks on two occasions in 2012 told Drechsel's domestic partner Koenig that Drechsel was too old, can't handle this, and that he needed to find another job (App. 697-699; 700-701 );

- On or about July 9, 2012, Drechsel received notice that Liberty Mutual had denied his claim for short term disability benefits, and that the temporary benefits would have to be repaid (App. 419; 420-22);

- Moore's supervisor Breor about two months before his discharge, said to Drechsel in an elevator "I don't want to stand next to this guy" (App. 17-19), and in February 2012, announced his intent to give Bravo awards to thirteen of Drechsel's peers because customers had called them out by name in CLF surveys over the prior two weeks for great customer service, intentionally overlooking Drechsel who had also been named by customers in the comments of a survey (App. 426; 428);

- When Drechsel returned from his FMLA leave related to a detached retina, Moore had put fake eyeballs all around his keyboard on his desk (App. 96-97);

- Following his termination Drechsel was mailed a horse head puppet with a noose around its neck that did not belong to Drechsel (App. 98-100; 709).

Drechsel's evidence of continual lack of promotion, repeated assertions he was too old which lead him to believe termination was inevitable, and badgering and harassment, raise a genuine issue of material fact in regard to a claim for constructive discharge.

C. **Dreschel Establishes a Prima Facie Case that Liberty Regarded Him as Disabled**.

Liberty asserts Drechsel's disability claims fail as a matter of law due to lack of adverse employment action; lack of evidence of actual disability; lack of evidence of record of disability, and lack of evidence as having been regarded as having a disability. (D.'s Br. at 32, 34). Drechsel concedes that he cannot state a prima facie case of disability or a record of disability. However, he does establish a prima facie case that Liberty regarded him as disabled. Liberty argues that Dreschel cannot raise a genuine issue of material fact as to whether it regarded him as disabled because none of his supervisors Fawkes or Moore knew of his high blood pressure, anxiety, or depression and the detached retina were too "transitory and minor" to have been regarded as an impairment, and states it did not know of the anxiety and depression conditions. (D.'s Br. at 34). As to being "regarded as disabled" Drechsel does not rely on either his detached retina or high blood pressure (although these conditions constitute relevant background evidence), but he does assert that Liberty regarded him as disabled due to anxiety and depression.[34]

A plaintiff makes a prima facie showing of ADA discrimination by establishing that: 1) he is disabled or regarded as disabled; 2) is qualified for the job; 3) was subjected to an adverse employment action on the basis of disability; and 4) was replaced by or treated less favorably than non-disabled employees. A person is regarded as having a disability if they: (1) have an impairment that does not substantially limit a major life activity but the employer perceives the impairment as such; (2) has an impairment that substantially limits a major life activity only because of the attitude of the employer toward such an impairment; or (3) has no impairment at all

---

[34] Whether an individual's impairment substantially limits a major life activity is not relevant to coverage under the regarded as disabled prong. *Suggs v. Cent. Oil of Baton Rouge, LLC*, 2014 U.S. Dist. LEXIS 90825, *17 (M.D. La. July 3, 2014).

but is regarded by the employer as having an impairment that substantially limits a major life activity. *See Bridges v. City of Bossier*, 92 F. 3d 329, 332 (5th Cir. 1996).   Drechsel asserts that he had an impairment that did not substantially limit a major life activity but which the employer perceived as an impairment. Here, Drechsel's evidence raises genuine issues of material fact that Liberty knew of his anxiety and depression and regarded him as disabled:

- Drechsel, for most of or all of 2012 had suffered nausea, insomnia, depression and vomiting due to stress at Liberty and appeared depressed (App. 710-713; 726);
- On June 4th, Drechsel fainted at his desk due to the stress from work, and went to the doctor that same day, reporting stress at work and was diagnosed with depression and given medication of depression and anxiety (App. 62-63; 464-65);
- The next day Drechsel went on FMLA leave and remained off work until July 2, 2012 (App. 399; 415-17, 466), and his short term disability paperwork indicated the reason for leave was anxiety and depression and Drechsel may also have communicated this anxiety to Fawkes (App. 26; 64-65; 407; 419-422);
- In June 2012 while he was on leave, Drechsel complained to his former supervisor Summerlin that he believed he was being mistreated due to his disability of anxiety and depression and in retaliation for the amount of medical leave he had taken (App. 83-85), and he and Moore discussed how Drechsel was doing (App. 127);
- Fawkes initially denied knowing that Drechsel's leave had anything to do with medical issues (App. 294-95), but later admitted he did know. (App. 303); and
- Moore was also aware Drechsel was out in June 2012 because he was sick (App. 129);
- When Drechsel returned in early July 2012 he reminded Fawkes that he had had serious health issues (App. 5).
- Addicks and Koenig discussed the stress of the job Drechsel was under.   (App. 359)

Drechsel thus raises genuine issues of material fact that Liberty knew about his anxiety and depression medical condition. Knowledge of an injury or condition is sufficient to impart knowledge of impairment for the purposes of establishing a prima facie case of being "regarded as disabled." *Pickney v. FRB of Dallas*, 2013 U.S. Dist. LEXIS 140334, *n.9 (W.D. Tex. Dep. 30, 2013).   *See also, Butler v. La*., 2014 U.S. Dist. LEXIS 168261, *8-9 (M.D. La. Dec. 3, 2014) (where the employer inquired about whether the plaintiff was on medication or had a germ phobia

or paranoia and documented that the plaintiff appeared to have "touch issue" that was sufficient to establish prima facie case that the employer regarded him as disabled). Thus, Drechsel's evidence that Liberty knew of his illness of anxiety and depression and of a need for leave to treat it is sufficient to establish it regarded him as disabled.

Furthermore, Drechsel presents other evidence that Liberty regarded him as disabled as a result of his anxiety and depression. When an employer demonstrates a change in attitude or treatment to a person due to a physical condition or indicates a belief that a condition is disabling, that can raise a genuine issue of material fact as to whether the employer "regards" an employee as disabled. *See, e.g.*, *McInnis v. Alamo Community College District*, 207 F. 3d 276 (5th Cir. 2000) (the plaintiff, who suffered a head injury, produced sufficient evidence he was regarded as disabled, due to evidence that there was a reference to his transfer as an "accommodation" for a "handicap"). Here upon Drechsel's return from leave he complained to supervisor Fawkes about the claims load and was told he should "find another position" (App. 24-25; 71). Also, Addicks told his domestic partner Koenig right when he returned from leave that Drechsel was "too old" and could not handle the position and needed to find another job. (App. 697-701). These comments about not being able to handle his position right after having gone on leave for anxiety and depression, indicate Liberty regarded Drechsel as disabled, and he thus establishes a prima facie case.

D. **Plaintiff Establishes a Prima Facie Case of FMLA Interference and Retaliation**.

Defendant asserts that Dreschel further fails to establish a prima facie case of FMLA interference or retaliation.

1. **Dreschel Establishes a Prima Facie Case of FMLA Interference**.

Defendant argues that Dreschel cannot establish a prima facie case of FMLA interference

because he received notification of eligibility for leave but failed to apply for it and quit his job without having invoked FMLA rights. (D.'s Br. at 39). Under the FMLA, a covered employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any [FLMA leave] right." 29 U.S.C. § 2615(a). To establish a claim for unlawful interference under the FMLA, a plaintiff must show: (1) that he was protected under the FMLA; (2) he suffered an adverse employment action; and (3) he was treated less favorably than an employee who had not requested leave, or the adverse decision was made because he sought protection under the FMLA. *Mauder v. Metro Transit Auth. of Harris County, Tex.*, 446 F. 3d 574, 583 (5th Cir. 2006). Under C.F.R. § 825.220(b), "interfering with" includes discouraging an employee from using such leave, and under C.F. R. § 825.220(c), "…employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions"). Further, under C.F.R. § 825.215(e)(2), an employee who returns to work following FMLA leave is entitled to "return to the same shift or the same or an equivalent work schedule." Under C.F.R. 825.215(a), an equivalent position is one that is virtually identical to the employee's former position in terms of pay, benefits and *working conditions, including privileges, perquisites and status*" (emphasis added).

Liberty does not dispute that Drechsel was entitled to FMLA leave and simply asserts that because he quit without filing the FMLA paperwork, that he cannot state an interference claim. This is just a wrong statement of the law. Employees "need not expressly assert rights under the FMLA or even mention the FMLA, but may only state leave is needed" to gain protection under the act. 29 C.F.R. §§ 825.302(c); 825.303(b). "Employees cannot waive, nor may employers induce employees to waive, their rights under FMLA." *See* 29 C.F.R. § 825.220(d). Drechsel

provided notice to Liberty on June 5, 2012 of a need for leave due to a serious health condition, and on June 19, 2012, Liberty advised him that his disability absence would be counted toward his FMLA leave allotment. (App. 414-15). Because he had applied for short term disability to run concurrently with the FMLA leave, Liberty indicated he did not need to submit FMLA certification paperwork pending determination of his short term disability claim. (App. 415). Drechsel was constructively discharged before being asked to submit medical certification due to the denial of the short term disability claim. (App. 76-77). Where an employer grants an employee leave without asking them to provide certification at the time the leave is taken, it cannot then assert that leave was not FMLA leave or that the employee did not seek to exercise rights under the FMLA. *Lucterhand v. Granite Microsystems, Inc*., 2007 U.S. Dist. LEXIS 15072, *26 (E.D. Wis. March 2, 2007). That is because once an employee informs the employer of a probable need for medical leave, the FMLA imposes a duty on the employer to conduct further investigation and inquiry. *Id., citing Burnett v. LFW Inc*., 472 F. 3d 471, 480 (7th Cir. 2006). Because Liberty granted Drechsel leave without asking him to provide certification pending the determination on his short term disability claim, and advised him that his disability absence would be concurrent with his FMLA leave, it cannot now assert that Drechsel did not seek to exercise rights under the FMLA. Drechsel thus meets the first prong of the prima facie case that he was protected by the FMLA.

In regard to the third prong for an FMLA interference claim, Drechsel alleges that his constructive discharge is the adverse employment action that occurred, and facts supporting such a claim are set forth supra. Finally, Drechsel alleges that he was treated less favorably than employees who had not requested leave, or the adverse decision was made because he sought protection under the FMLA.   *Mauder,* 446 F. 3d at 583.

Fawkes initially denied knowing that Drechsel's leave had anything to do with medical issues (App. 294-95), but later admitted he did know. (App. 303). Moore was also aware Drechsel was out in June 2012 because he was sick. (App. 129). Drechsel's evidence shows that he was treated less favorably that those not requesting leave includes that when Drechsel returned from leave on July 2nd:

- There was no change to the unreasonably heavy volume of his claims load and the unequal distribution of claims between him and other Claims Specialist IIs (App. 723);
- He found there had not been a suspension of claims to him which had been supposed to occur due to company procedure given that his leave was more than three weeks (App. 37; 211-12; 301; 462);
- Nothing had been done to have anyone work on Drechsel's claims that were pending on his leave or to transfer them, which can be done (App. 248; 299-300);
- He had an inordinate number of emails with attachments that needed to be posted to the file, and was told he had only two days to complete them, when normally when a claims specialist was out a backup employee or their manager checks their emails, answers their calls, addresses the files, and made sure there was nothing important that was not put in the file, but his files had not been attended to or his emails checked (App. 67-70; 215);
- Fawkes treated Drechsel very negatively upon his return, talking with him in an angry tone and refusing to look at Drechsel when he was speaking (App. 78-80);

As noted *supra*, under C.F.R. § 825.215(e)(2), an employee who returns to work following FMLA leave is entitled to "return to the same shift or the same or an equivalent work schedule" and C.F.R. 825.215(a) defines an equivalent position as one that is virtually identical to the employee's former position in terms of pay, benefits and *working conditions, including privileges, perquisites and status.*"   A claim for FMLA interference is stated when an employee's job duties are altered upon a return from leave other than simply as to title and benefits.   *See, e.g., McFadden v. Seagoville State Bank,* 2009 U.S. Dist. LEXIS 693, *28 (N.D. Tex. Jan. 6, 2009) (summary judgment not warranted on claim that job returned to was not equivalent where

employee presented evidence that the days and hours would not be the same as employee created genuine issue of material fact on that issue); *Cooper v. Olin Corp.*, 246 F. 3d. 1083, 1091-92 (8th Cir. 2001) (declining to grant summary judgment where employee upon return retained title and salary but was assigned office work rather than actual work as locomotive engineer). Drechsel's evidence indicates he was not returned to a Claims Specialist II position with the same working condition and privileges as other Claims Specialist II. He further establishes that his own position was objectively worse because he had even a more unmanageable claims load and one which was far higher than others in his position. Because Liberty interfered with Drechsel's FMLA leave by significantly changing his position upon his return from leave, Drechsel establishes he was treated less favorably than an employee who had not requested leave. Unlike FMLA retaliation claims, *infra*, FMLA interference claims are not subject to the *McDonnell-Douglas* burden shifting framework. *Lottinger v. Shell Oil*, 143 F. Supp. 2d 743, 770 (S.D. Tex. 2001). Because Dreschel has raised genuine issues of material fact that he suffered FMLA interference, Defendant's motion on this basis must be denied.

## 2. **Dreschel Establishes a Prima Facie Case of FMLA Retaliation**.

Liberty further asserts that Dreschel cannot make out a prima facie case of FMLA retaliation because Dreschel quit his job before applying for FMLA leave. (D.s Br. at 41). To establish a claim for retaliation under the FMLA, a plaintiff must show he: (1) engaged in a protected activity; (2) the employer discharged him; and (3) there is a causal link between the protected activity and the discharge. *Richardson v. Monitronics Int'l, Inc.*, 434 F. 3d 327, 332 (5th Cir. 2005). Further, "when evaluating whether the adverse employment action was causally related to the FMLA protection, the court shall consider the 'temporal proximity' between the FMLA leave, and the

termination." *Mauder v. Metro. Transit Auth. of Harris County*, 446 F.3d 574, 583 (5th Cir.2006). This Circuit has held that termination less than one month from return from FMLA leave is sufficient to establish a causal link for purposes of a prima facie case. *Powers v. Woodlands Religious Community, Inc.*, 323 Fed. Appx. 300 (5th Cir. April 18, 2009). As noted above in regard to the FMLA interference claim, Drechsel demonstrates that he sought to take FMLA protected leave and he thus establishes the first element of his prima facie case, and as further noted above at p. * he set forth the evidence raising fact issues on the constructive discharge. Moreover, Drechsel's constructive termination following less than a month after his return from FMLA leave, as a matter of law is sufficient to establish a causal link for purposes of a prima facie case.

In the absence of direct evidence of retaliation, the court will then apply the burden-shifting framework of *McDonnell Douglas* to analyze the plaintiff's claims. *See Hunt v. Rapides Healthcare Sys., LLC*, 277 F. 3d 757 (5th Cir. 2001). Once the plaintiff makes a prima facie showing, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action. *Id.* at 768. Thereafter, the burden shifts back to the employee to show that the employer's reason is a mere pretext for the underlying purpose of retaliation. *Id.* As noted infra, Drechsel raises genuine issues of material fact regarding pretext.

E. **Genuine Issues of Material Fact Evidence Retaliation Against Dreschel**.

Liberty asserts that Drechsel's claims of retaliation in violation of the ADA, ADEA, and TCHRA fail as a matter of law because there was no adverse employment action and he did not did not engage in any protected activity before his resignation of employment. (D.'s Br. at 37). A plaintiff establishes a *prima facie* of retaliation by showing: (1) that they engaged in protected activity; (2) that an adverse employment action occurred; and (3) that there was a causal

connection between the participation in the protected activity and the adverse employment decision. *Jones v. Flagship International*, 793 F.2d 714, 724 (5th Cir. 1986); *Barrow v. New Orleans S.S. Ass'n,* 10 F.3d 292, 298 (5th Cir. 1994); *Hamilton v. Rodgers*, 791 F.2d 439, 441 (5th Cir. 1986).

As noted *supra*, Dreschel disputes that he did not suffer actionable adverse employment actions, including compensation discrimination, promotion discrimination, and constructive discharge. Liberty further argues that Dreschel did not complain to anyone at the company that he felt discriminated against due to age, disability, or use of FMLA leave, and therefore did not engage in protected activity. (D.'s Br. at 37). A plaintiff is protected under discrimination statutes if they make a complaint about discrimination based on a reasonable, good faith belief that the conduct complained of is unlawful. *Clark County School District v. Breeden*, 532 U.S. 268 (2001). Informal complaints to supervisors have been recognized as protected activity under the oppositional clause. *See, e.g., Minor v. Alcatel USA Res., Inc.*, 2007 U.S. Dist. LEXIS 31894, *20 (E.D. Tex., May 1, 2007) (where there was some evidence that the plaintiff's complaints identified to the employer a concern about differential treatment due to sex, that is sufficient to put the employer on notice that the complaints were based on gender discrimination). Even where the conduct complained of is deemed insufficient to constitute discrimination or harassment, courts have found it to be based on a reasonable good cause belief that is occurred, which is sufficient to establish oppositional conduct. *See, e.g., Long v. Eastfield College*, 88 F.3d 300, 305 (5th Cir. 1996) (rejecting plaintiff's claim of a sexually hostile working environment based on a single sexual joke made by male employee, but allowing plaintiff to proceed on retaliation claim for "protesting" what she "believed" to be a sexually hostile environment).

Here, Drechsel presents evidence that he engaged in protected activity by protesting to Fawkes in May 2012 that he was being set up to fail because the work load was unmanageable, and that the environment was negative\and abusive. (App. 26; 64-65; 407). Drechsel further engaged in protected activity by stating that he could not take much more of the abuse and was willing to contact an attorney if necessary. (App. 26; 64-65; 407). Threatening to file an EEOC complaint constitutes protected activity. *Lee v. Healthfirst, Inc.*, 2007 U.S. Dist. LEXIS 14891, *73 (S.D.N.Y. March 1, 2007). *See also, EEOC v. Dunbar*, 92 Fed. Appx. 83, 84 (5th App. Ct. 2004) (the employee stating in a letter an intent to hire a lawyer and threatening a lawsuit could be a protected activity which could be causally connected to an adverse employment action. Here, Drechsel's threatening to Fawkes that he would consult an attorney constitutes protected activity, especially combined with the fact it was so near in time age related comments of Fawkes that he was too old. In about March 2012, Fawkes told Drechsel that he would not be getting a pay raise because he was too old and they did not want him there anymore (App. 14; 22-23; 45; 268-69; 681). Drechsel, less than two months later complained to this same supervisor about issues relating to this unfair workload and other unfair workload and said he would consult an attorney if matters were not remedied. These facts raise a genuine issue of fact of whether he engaged in protected conduct. The jury is entitled to determine that Fawkes, having referred to Drechsel as being "too old" to do his job when discussing Drechsel's job performance, would have known that Drechsel's threat to consult an attorney constituted a complaint about age discrimination.

Additionally, Drechsel engaged in protected conduct when in June 2012 while he was on leave, complained to his former supervisor Summerlin that he believed Liberty was taking actions him because of his disability and in retaliation for the amount of medical leave he had taken. (App.

83-85). Moore and Summerlin subsequently discussed how Drechsel was doing (App. 127), and this also raises genuine issues of material fact that Liberty was aware that Drechsel was asserting discrimination on the basis of disability or what they regarded as his disability due to his having to take FMLA leave.

Drechsel further raises genuine issues of material fact that that there was a causal connection between the participation in the protected activity and his constructive discharge. The complaints he made in May and June 2012, and the actions leading to his constructive discharge, as related supra, occurred within two a two month time frame. In considering whether a causal connection exists, courts look to various factors, including evidence of retaliatory *animus*, and evidence that the adverse action was taken after the employer became aware of the protected activity.   The Fifth Circuit has reversed a district court's granting of summary judgment on a retaliation case, indicating that "suspicious timing," in the context of viewing "the totality of this evidence," is sufficient to survive summary judgment.   *Shackelford v. Deloitte & Touche, L.L.P.*, 190 F.3d 398 (5th Cir. 1999).    Moreover, close timing *alone* may be sufficient to provide a causal connection, when the adverse action happens in close proximity to the discrimination complaint. "Close timing between an employee's protected activity and an adverse action against [her] may provide the 'causal connection' required to make out a prima facie case of retaliation."   *Swanson v. Gen. Servs. Admin.*, 110 F. 3d 1180, 1188 (5th Cir. 1997), *cert. denied*, 529 U.S. 948 (1998).   *See, e.g., Garret v. Cornstar*, 1999 U.S. Dist. LEXIS 9361, *16-17 (N.D. Tex. May 26, 1999) (termination four months between the plaintiff being identified as a witness in a co-worker's sexual harassment suit and two months after signing an affidavit for the lawsuit sufficiently close timing to prove causal connection); *Richard v. Cingular Wireless LLC*, 233 Fed.App'x 334, 338

(5th Cir. 2007) (two and a half months between protected conduct and termination sufficiently close to prove causal connection); *Richardson v. Prairie Opportunity*, 470 Fed. App'x 282, 286-87 (5th Cir. 2012) (just less than two months between complaint and employment action is indicative of a causal connection); *Haire v. Bd. Of Supervisors of La. State Univ.*, 719 F. 3d 356, 368 (5th Cir. 2013) (four month period between complaint and alleged discriminatory decision, coupled with changes to the plaintiff's job duties in this period, raised inference of retaliation). The constructive discharge of Drechsel within approximately two months following his complaints is evidence of causal connection, and sufficient to establish a prima facie case of retaliation.

F.   **Dreschel Establishes Alleged Non-Discriminatory Reasons for Lack of Promotion and Pay Raise and Constructive Termination, are Pretextual and Due to His Age, Disability, or FMLA leave.**

Liberty asserts that even if Dreschel could establish a prima facie case of age or disability discrimination, it had legitimate non-discriminatory reasons for its actions and that Dreschel cannot establish those reasons were pretextual. (D.s Br. at 25). Drechsel, however, presents substantial evidence that the reasons given by Liberty for the actions against him are pretextual.

1.   **Dreschel Demonstrates Pretext by Evidence of Discriminatory Conduct and Animus.**

Dreschel demonstrates pretext by evidence of discriminatory conduct and animus. Where comments made by high-ranking management officials may reasonably demonstrate discriminatory attitudes, those comments are relevant to the determination of pretext. *Atkinson v. Denton Publishing Co.*, 84 F.3d 144, 149 (5th Cir. 1996). *See e.g., Woodhouse v. Magnolia Hosp.*, 92 F.3d 248, 254-55 (5th Cir. 1996) (evidence that unidentified "they" were going to fire the older people could be considered as evidence of intentional discrimination). Here several comments evidence discriminatory motive:

- After Drechsel complained to Fawkes about his claims load in 2011 (App. 274) and that is was inequitable, Fawkes told him that he should look for another position because he was "too old" (App. 112)
- In 2011, Addicks said Drechsel was "falling apart" (App. 30-31);
- Addicks on two occasions in 2012, including July 5, 2012, told Drechsel's domestic partner Koenig that Drechsel was too old, can't handle this, and that he needed to find another job (App. 697-703);
- Drechsel learned that some of his new claims file assignments were coming from Unit Manager Steve Perkins, who was significantly younger than Drechsel, and he was told Perkins had said to another employee that Liberty that the company needed to get rid of all of these old employees and hire people right out of college (App. 103-04);
- Breor, Moore, Addicks and Perkins made comments to the effect that Drechsel was "too old," should be retired and needs to retire.   (App. 725)
- Moore's supervisor Breor, about two months before his discharge, when they were in an elevator together said to Drechsel, "I don't want to stand next to this guy" and did not respond when Drechsel asked why (App. 17-19);
- Breor intentionally overlooked Drechsel for a Bravo award in 2012, admitting only when Drechsel called it to the attention of Liberty that he should also have received such an award (App. 426; 428).
- Breor, Fawkes and Moore referred to him as "Pirate."   (App. 726)

Overall, these comments made by high-ranking management officials reasonably demonstrate discriminatory attitudes and are relevant to the determination of pretext. The discriminatory animus of all of these supervisors is relevant as Drechsel's evidence indicates that Liberty made promotion decisions for Sr. Claims Specialist positions by consensus, and all current former and current supervisors would be consulted as well as Moore. (App. 173; 337).   Notably On July 5, 2012, Moore told Drechsel that he knew he did not like what he was doing at Liberty, indicating he was aware of Drechsel's complaints to Fawkes about promotion and workload. (App. 215-16).

Additionally, Drechsel demonstrate discriminatory and retaliatory animus through evidence that Liberty took actions to attempt to get him to quit:

- The claims assignment system at Liberty allows reassignment of claims (App. 32-33; 199-201; 247; 356-58) and Drechsel's supervisors did reassign claims

between Specialist (App. 33; 35-36; 248-49; 343-44);

- there was no suspension of new claims to him during his leave as was usual when employees were out more than three weeks, and no transfer of claims from him which also often occurred when employees were out on leave (App. 37; 211-12; 214-15; 248; 301; 462);
- Drechsel overheard statements from supervisors, including Addicks, that we can make life very difficult for you by assigning you a lot of claims, and she continued to assign him claims (App. 60-61);
- when Drechsel returned he told Fawkes that he had had some serious health issues. But Fawkes just spoke to him in a sharp tone of voice and acted angry and refused to look at Drechsel when he was speaking (App. 5, 78-80);
- when Drechsel complained about his claims load upon his return from leave, Fawkes said he should find another position (App. 24-25; 71).

Finally, Drechsel presents evidence of discriminatory animus following his termination:

- When Liberty mailed Drechsel's personal property by mail to his home following the constructive discharge it included a horse head puppet with a noose around its neck, and Drechsel reported it to HR at Liberty (App. 98-100; 709);
- No one was disciplined for sending the horse head noose puppet (App. 189-90; 313-314);
- Moore claimed to have seen the horse head puppet with the noose outside of Drechsel's cubicle while he was working there and that he talked to him about it but that is untrue (App. 190-98);
- Fawkes also claims he had seen the noose puppet hanging outside of Drechsel's cubicle while he worked there, but did not investigate or report it (App. 309-10), but as noted this Drechsel denies this puppet was his or ever in his cubicle.

The referenced comments made by management employees of Liberty reasonably demonstrate discriminatory attitudes which are relevant to the determination of pretext.

**2. <u>Drechsel Raises Genuine Issues of Fact in Regard to Pretext as to Failure to Promote Through Evidence of Superior Qualifications and Falsity of Reasons for Failure to Promote</u>**.

In failure to promote cases, a plaintiff does not necessarily have to prove that she was the most qualified candidate. "Pointing to clearly superior qualifications is one way to demonstrate intentional discrimination, but it is not the only way." *Sanders v. Anadarko Petroleum Corp*., 108 Fed.Appx. 139, 143 (5th Cir. 2004), *citing Julian v. City of Houston, Tex.,* 314 F.3d 721, 728 (5th

Cir.2002) "A plaintiff may also establish pretext by presenting evidence that the employer's proffered explanation is false or unworthy of credence because it is not the real reason for the adverse employment action. *Laxton v. Gap Inc.,* 333 F.3d 572, 578 (5th Cir. 2003). *See also, Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.,* 482 F. 3d 408, 412 (5th Cir. 2007) ("Burrell has two methods available to him to try to prove that Dr. Pepper's proffered reason for failing to promote him was a pretext for racial discrimination: (1) Burrell could show that Dr. Pepper's proffered explanation is false or "unworthy of credence"; or (2) Burrell could try to prove that he is "clearly better qualified" than the person selected for the position"); *Rutherford v. Harris County*, 197 F. 3d 173, 182, f.9 (5th Cir. 1999) (proving superior qualifications is just one way to establish pretext, and because the plaintiff did not allege superior qualifications the "clearly better qualified" standard did not need to be used). Where there are simply announcements of promotions or promotions without posting, to require a plaintiff to show they "applied" would not be fair and is not required. *Fuller*, 81 F. 3d at 730.

Dreschel asserts that in terms of promotion, numerous substantially younger employees with lesser qualifications were given growth promotions where there were no open positions, posting, or applications. Drechsel demonstrates a history of excellent job performance and performance of Sr. Claims Specialist duties that should have resulted in his promotion:

- Drechsel consistently received very good annual performance evaluations, as indicated by his 2009 overall "outstanding" score (App. 441), and by the fact that year he received no customer complaints but numerous compliments from his customers (App. 440, 449, 458);
- Drechsel was recognized for his excellent productivity and leadership abilities, including in 2010 for the speed of his claim resolution and exceptional customer comments (App. 450);
- In 2011, Drechsel received two "Bravos," for his contribution to the success of the business unit and increased productivity, and was lauded as a leader amongst my

unit and the organization on most technical issues" (App. 458-59);

- In 2012, Drechsel achieved the highest customer service score in the entire region (App. 722) even if the face of a very heavy claims load (App. 204);
- In 2009-2011 reviews, Drechsel was recognized as a "mentor" and his supervisors admitted he was an "informal leader" to his peers because they sought him out on coverage and technical issues often (App. 440; 450; 459);
- Drechsel was the only person backing up Fawkes when he was out of the office, in regard to claims payment and file review authorization for his other subordinates (App. 290; 305-06);
- Drechsel was recognized as an informal leader amongst the team and sought out regularly for their opinion (App. 291).

Indeed, Drechsel's evidence supports that he was clearly more qualified than those promoted to Sr.

Claims Specialist:

- Substantially younger Menard was promoted although she had less experience than Drechsel), no greater certifications or achievements (App. 476), and a lower overall performance review score than him (App. 441; 476);
- Very substantially younger Stults was promoted in 2011 after the positon was posted during Drechsel's FMLA leave (App. 479-81; 505; 577), despite the fact she had only four years tenure; no prior experience as an adjuster; far less experience; and no more certifications or achievements than Drechsel (App. 481-88; 505);
- Two months after Drechsel's constructive discharge, Liberty promoted two of Drechsel's significantly younger, former peers, Stiles and Gregory, both of whom had substantially less tenure and experience as well as documented weaknesses (App. 175; 499; 506; 581);
- In April 2013, substantially younger Sommers was promoted (App. 511; 579), although she had far less experience and tenure than Drechsel.

In addition to Drechsel's evidence of excellent qualifications for promotion, and a pay

increase, he presents evidence that Liberty's management employees lack credibility in asserting

the reasons Drechsel was not promoted or given a pay increase:

- Beginning in 2009 Drechsel regular sought promotion but was denied with the explanation were no openings (App. 722), but Claims Team Managers had the authority to promote employees with the approval of Moore even if openings were not posted (App. 679-680);
- Fawkes asserted Drechsel would not have been able to receive any sort of promotion without there being an open position (App. 260) but there is no policy against promotions without posting (App. 502), and Drechsel had been promoted in

the past without such posted openings (App. 88);

- Addicks told Drechsel he could not be promoted without an open position but Addicks requested and Moore approved, a promotion for substantially younger Edna Menard to Sr. the role sought by Drechsel (App. 87; 477, 577), and Addicks thus falsely asserted in her deposition that all promotions were the result of a position posting, interviews, a recommendation and second interviews (App. 333-34)

- Dreschel was told he would not get a raise because he made too much money (App. 14-15) even though Drechsel was not at the top of his pay band (Liberty's Appendix at 197, para. 8), and sometimes approval was given for raises outside the pay band salary ranges of an employee (App. 151-52);

- Addicks evidenced animus toward Drechsel when he complained about the denial of a raise by asking him to turn in his badge (App. 676);

- Drechsel continued to seek promotion in 2010-2012, including April 2012, but was not promoted   (App. 722), despite his supervisor admitting he knew Drechsel had the skill set for a Sr. Claims Specialist (App. 90);

- Drechsel's supervisor tries to justify the lack of promotion by telling Drechsel he needed to "take on a more leadership role" when annual evaluations by Fawkes in 2010 and 2011 noted that Drechsel was already doing that and in fact was a "mentor" and "leader" in the unit (App. 257-62);

- Drechsel was not promoted despite the fact he was already handling the same type of claims that those with Sr. Claims Specialist were handling base as he was handling claims over $50,000 where the property was not (App. 142-43);

- Liberty posted only one Sr. Claims Specialist position from 2010 to 2012, and did so during a four week period when Drechsel was on FMLA leave  (App. 89; 722-723);

- Drechsel was given Individual Contributor Talent Reviews that were lower than what should have been expected given his overall performance review scores, which unfairly deemed him as not ready for promotion (App. 158-60; 468-69; 473);

The factfinder is entitled to find witnesses who come across as lacking in credibility, appear to exaggerate complaints about the plaintiff, or appear to be attempting to justify a predetermined decision, as lacking in credibility.   *See Laxton v. Gap, Inc*., 333 F. 3d 572 (5th Cir. 2003). *See also, Ray v. Iuka Special Mun. Separate School Dist*., 51 F. 3d 1246 (5th Cir. 1996) (in credibility dispute as to whether decision makers for the employer were aware of an EEOC complaint, the factfinder can find the employee's witness more credible even though he could not identify who told him that the decision makers had knowledge of the EEOC complaint). Questions

regarding the credibility of the defendant's witnesses therefore create genuine issues of material fact regarding pretext. "The factfinder's disbelief of the reasons put forward by the Defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the *prima facie* case, suffice to show intentional discrimination....no additional proof of discrimination is required." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993). Drechsel's evidence raises genuine issues of material fact that Liberty's proffered explanation for failure to promote Drechsel is false or "unworthy of credence" and that he was clearly better qualified than person promoted to the position in the 300 day period before he filed his charge of discrimination, and summary judgment must therefore be denied.

### 3. Dreschel Demonstrates Pretext by Evidence by Differential Treatment of Other Claims Specialists.

Dreschel raise genuine issues of material fact regarding pretext through proof of differential treatment from other Claims Specialists. First, pretext is evidenced by Liberty's assertion as noted *supra*, that Dreschel cannot be promoted without making formal application and by his promotion of substantially younger employees without such application. Pretext is shown by evidence that the employer treated other similarly situated individuals differently. *See Ramirez v. Landry's Seafood*, 280 F. 3d 576, 577-578 (5th Cir. 2002). *See, e.g., Garrison v. Tex. S. Univ*., 2012 U.S. Dist. LEXIS 15912, at *17 (S.D. Tex. Oct. 23, 2012) (more favorable treatment of similarly situated individuals evidences pretext). Requiring Dreschel to apply to be promoted, despite his numerous requests to HR and managers for promotion, and promoting other Claims Specialists without such application, as noted at supra, establishes pretext. Pretext is also shown by the fact younger employees were given Sr. Claims Specialist titles and pay, even though there is evidence they have neither the skills, experience of certifications as Drechsel, as noted supra.  Pretext is

also shown by the fact Drechsel was treated differently than others in regard to assignments of claims. Disparate treatment evidences an employer's discriminatory intent, including s providing workers outside the protected class with more advantages.   *Uffelman v. Lone Star Steel Co.*, 863 F.2d 404, 408 (5th Cir. 1989).   *See, e.g., Glasmire v. Public Storage*, 2013 U.S. Dist. LEXIS 64794, *18 (N.D. Tex. May 7, 2013) (summary judgment on age claim improper where the plaintiff presents evidence that the younger managers received more favorable treatment and   the older worker was criticized for not using new technology); *Miller v. Raytheon*, 716 F. 3d 138, 146 (5th Cir. 2013) (evidence that employer deviated from its normal procedures and that similarly skilled younger employees were not treated the same as the plaintiff is circumstantial evidence of age discrimination). Because Drechsel's evidence raises genuine issues of material fact as to all of his claims, summary judgment must be denied.

Here Dreschel presents evidence that Moore is not credible:   On a couple of occasions, Moore had been unhelpful to Drechsel when he approached him on some claims. (App. 13).   Moore attended a surprise birthday party for Drechsel. He initially testified that he did not attend and did not know that Drechsel had turned 60 just before he left Liberty, but upon further questioning he admitted recalling Drechsel's birthday cake having a "60" on it.   (App. 187-88; 205).   The evidence that Moore has misrepresented facts in this matter evidences pretext as the jury is entitled to find his assertions about the real level of Drechsel's work as lacking in credibility and attempting to justify a predetermined decision.

### 4. <u>Dreschel Raises Genuine Issues of Material Fact Regarding Pretext as to FMLA Retaliation</u>.

Drechsel further demonstrates pretext in regard to his FMLA retaliation claim. Temporal proximity combined with other indications of retaliatory animus raise sufficient evidence of a

causal link between FMLA leave and the adverse action. *See, e.g., Holland v. Shinseki*, 2012 U.S. Dist. LEXIS 6788, *55 (N.D. Tex. Jan. 18, 2012) (denying summary judgment based on employee not having an AWOL designation removed from her records unlike other employees, and the temporal proximity of the FMLA leave and adverse actions six to nine months later); *Trevino v. UPS*, 2009 U.S. Dist. LEXIS 98738 (N.D. Tex. October 23, 2009) (denying summary judgment on grounds termination followed several weeks after the application for FMLA leave, along with evidence of an earlier remark by supervisor about employee having run out of FMLA leave); *Villalon v. Del Mar College Dist.*, 2010 U.S. Dist. LEXIS 82766,*19-21 (S.D. Tex. August 13, 2010) (temporal proximity of four months between leave and termination, along with supervisor's negative reaction to use of leave, raises genuine issues of material fact regarding FMLA retaliation); *Hayden v. Garden Ridge Management*, LLC., U.S. Dist. LEXIS 119726 (E.D. Tex. December 22, 2009) (temporal proximity of less than two weeks between request for leave and termination in addition to evidence of negativity by management to request sufficient to raise genuine issues of material fact regarding FMLA leave).

Drechsel demonstrates animus following his taking of FMLA leave for a detached retina in 2011 (App. 403; 405-06). He received pressure from Liberty to return to work earlier than he felt ready (App. 55-57), and upon his return the volume of his claims assignments drastically increased so that he had more claims than any other Claims Specialist II (App. 38-39; 47-48; 281-83; 461; 723).   When Drechsel returned from his FMLA leave related to the detached retina, Moore had put fake eyeballs all around his keyboard on his desk and he and other managers referred to Drechsel as Pirate (App. 96-97; 726).   Accordingly, Drechsel raises fact issues as to whether the asserted legitimate non discriminatory reasons proffered by Defendant are pretextual.

### III.    CONCLUSION.

Drechsel respectfully prays that this Court Deny Defendant's Motion for Summary Judgment.


Respectfully Submitted,


/s/Christine Neill
Christine Neill
cneill@neillbyrnelaw.com
Texas Bar No. 00796793
Jane Legler Byrne
Texas Bar No. 03565820
jleglerbyrne@neillbyrnelaw.com
Neill & Byrne, PLLC
3141 Hood Street, Suite 310
Dallas, Texas 75219
(214) 748-7777
(214) 748-7778 (facsimiles)


Attorneys for Plaintiff Reinhard Drechsel

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on August 19, 2016, a true and correct copy of the foregoing was served on Defendant's counsel listed below, via the ECF system:

Angela D. Green, Esq.
Ogletree, Deakins, Nash Smoak & Stewart, P.C.
500 Preston Commons
8117 Preston Road
Dallas, Texas 75225

Tiffany L. Cox
Ogletree, Deakins, Nash Smoak & Stewart, P.C.
112 E. Pecan Street, Suite 2700
San Antonio, TX 78205


/s/ Christine Neill_____
Christine Neill